## COMMISSIONER OF INTERNAL REVENUE v. HENRY'S ESTATE et al.

### No. 9024.

Circuit Court of Appeals, Third Circuit.

Reargued Jan. 22, 1947.
Decided April 17, 1947.

O'CONNELL, Circuit Judge, dissenting.

———◆———

Muriel S. Paul, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Asst. to Atty. Gen., on the brief), for petitioner.

Henry S. Drinker and Richard K. Stevens, both of Philadelphia, Pa. (Frederick E. S. Morrison, of Philadelphia, Pa., on the brief), for respondents.

Wm. Clarke Mason, Frederick C. Newbourg, Jr., Joseph H. Grubb, Jr. and John Russell, Jr., all of Philadelphia, Pa., for amici curiæ.

Before BIGGS, MARIS, GOODRICH, McLAUGHLIN, O'CONNELL, and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from a decision of the Tax Court which found against the Commissioner in a dispute involving an estate tax upon certain portions of the estate of Sallie Houston Henry. The case has been twice argued in this Court, the second time before the full Court following the granting of a petition for rehearing after the entry of our original judgment on June 11, 1946.

The controversy can be very simply stated. It turns upon the effect of a document which bears date of December 31, 1915. If this document became legally effective on that date or before Congressional Joint Resolution of March 3, 1931,[1] the Commissioner concedes that no tax is due. If, as he argues, it became effective or complete after that date, the tax is due and the respondents admit it. No dispute upon the question of the tax laws of the United States arises. The sole question is concerned with the transaction of December 31, 1915.

Following the original argument of this case the Court on June 11, 1946 reversed the decision of the Tax Court. Upon the

petition of the respondents rehearing was granted and the case has now been argued before the full Court. Before proceeding to consider the questions which the appeal raises we repeat the facts as we originally stated them. They are as follows:

We are not confronted with a dispute over the facts. Henry H. Houston was a prominent Philadelphia citizen. He was the head of a family which included his wife, Sallie Houston, and their three children, Samuel F., Gertrude and Sallie, all of whom married and had children.

In 1895, Grandfather Houston died, leaving a substantial estate consisting principally of real property and securities, with part of which we are here concerned. These were of two types. Some were stocks in the several companies which had grown out of the Standard Oil Trust. Others were shares in different corporations. Grandfather Houston left the residue of his estate in trust. The life tenant beneficiaries of this trust were Grandmother Houston, Samuel F. Houston, Sallie Houston Henry, and Gertrude Houston Woodward. The remaindermen were grandchildren of Henry H. Houston.

Grandmother Houston died in 1913, leaving a large estate of her own. By her will, she disposed of the residue of her estate, giving it in trust for the benefit of her grandchildren.[4] She divided her residuary estate into twenty-one equal parts but disposed of these in unequal proportions. She gave 3/21 to the children of Sallie Houston Henry and 18/21 to the children of Samuel F. Houston and Gertrude H. Woodward. The net income was to be paid over (in those proportions) to "each of * * * said grandchildren until he or she shall have attained the age of 30 years," when the respective share of each was to be paid over to him or to his issue, surviving spouse, or surviving brothers and sisters.

In the administration of the Grandfather Houston and Grandmother Houston estates two serious questions arose. During the period between the deaths of Grandfather and Grandmother Houston the trustees under the will of Henry H.

1 46 Stat. 1516, March 3, 1931, 26 U.S.C.A. Int.Rev.Code, § 811(c).

Houston received a large number of "extraordinary distributions" on the Standard Oil securities. Subsequently, the trustees received from time to time "extraordinary distributions" [5] on the securities other than those of Standard Oil origin. The trustees followed the practice of adding all these distributions to the principal of the trust estate. Did all or any part of these "extraordinary distributions" constitute distributable income to the life tenants?

The other question which arose followed Grandmother Houston's death. Was her gift of the residue to her grandchildren void because it violated the Rule against Perpetuities? This question attained special importance because the residue of Grandmother Houston's estate was $1,700,000, exclusive of her share in the "extraordinary distributions," rather than $630,000 as she had supposed.[6]

In 1913, following Grandmother Houston's death, the three Houston children had, therefore, two strongly supportable claims. One embraced the "extraordinary distributions" (as life tenants of the Grandfather Houston trust). The other was the right to the entire residue of Grandmother Houston's estate if its gift violated the Rule against Perpetuities.[7]

On the other hand, the Houston grandchildren, as remaindermen under Grandfather Houston's trust, had a claim to all or part of the "extraordinary distributions" and, of course, to the $1,700,000 plus in the residuary estate of Grandmother Houston.

This, then, was the situation which prevailed on December 31, 1915. To understand better the events which occurred on that significant date it would be well to enumerate the interested parties in both Houston estates. These were (a) Sallie Houston Henry and her children, (T. Charlton Henry, Gertrude H. Henry, and Elizabeth W. Henry); (b) Samuel F. Houston and his children (Edith C. Houston Brown, Margaret C. Houston Meigs, Henry H. Houston 2nd, Eleanor Houston Smith); (c) Gertrude Houston Woodward and her children (H. H. Houston Woodward, George Woodward, Stanley Woodward, Charles H. Woodward, and Gertrude Woodward). In addition, there were also Samuel F. Houston's wife, Charlotte H. S. Houston, and Gertrude H. Woodward's husband, George Woodward. Sallie Houston Henry's husband died prior to 1915. Of these twelve grandchildren, seven were minors and therefore incapable of binding themselves with respect to the legal questions outstanding.

Both Grandfather and Grandmother Houston had expressed in their wills the desire that their estates be administered without the filing of Inventories or Accounts in the Orphans' Court. This strengthened the desire of the parties concerned to settle all outstanding questions inter se without resort to court proceedings.

Accordingly, an elaborate document entitled "Deed of Family Settlement and Trust" was prepared by eminent Philadelphia lawyers.[8] On December 31, 1915, it was signed by the three Houston children, their spouses and those grand children who were of age (and their spouses), by the corporate trustee under Grandfather Houston's will, and by the executor and trustee under Grandmother Houston's will. From December 31, 1915 on, the trustees held the questioned securities as part of the principal of Grandfather Houston's trust, paying the income therefrom to the Houston children. The residue of Grandmother Houston's estate was administered in accordance with her will as to $630,000 but as to the balance, equal distributions were made to the grandchildren.

In 1922, Sallie Houston Henry, Samuel F. Houston and Gertrude Houston Woodward executed a "deed of confirmation" under which they confirmed the deed of 1915 and released and quitclaimed to the trustees under the will of Grandfather Houston all their "right, title, interest or claim" to the Standard Oil securities, "it being expressly understood, however, that nothing herein contained shall affect the right of said life tenants to all cash dividends or income paid or to be paid in cash on any of said shares or securities, nor shall affect their rights as reserved to them by the sixth paragraph of said deed of family settlement."

Sallie Houston Henry died in 1938. The Commissioner attempted to lay the estate tax on her share of the life tenants' rights in the Standard Oil and other securities received by Grandfather Houston's trustee as "extraordinary distributions." [9]

Following a thorough presentation on the reargument of the matter our own further reflections have convinced the majority of us that we were mistaken in treating the question presented as that kind of "clear-cut question of law" in which we may exercise independent judgment. We conclude, rather, that this is the type of question to which the doctrine of the Dobson case [2] and the many authorities proliferating from it are applicable. In such a case the Tax Court's conclusion, if not an egregious mistake, is to be accepted as final. It is one of those situations such as the Court speaks of in Commissioner v. Scottish American Co., 1944, 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113, where it is the business of the Tax Court to choose "from among conflicting factual inferences and conclusions those which it considers most reasonable." [3]

As stated at the outset, the controversy arises from the elaborate "Deed of Family Settlement and Trust" executed on December 31, 1915, as described above. No one suggests that back of this deed was any thought of tax evasion or avoidance. There are no facts to show it and judicial knowledge of the history of federal tax legislation indicates that, as of that time, any change of the impact of taxation growing out of the deed would have been a minor matter. Nor is the document in question one of the type in which the use or omission of certain terms by the parties carries, irrespective of their state of mind, a given legal effect. Thus it is not comparable to the necessary appearance of the term "heirs" in a deed of conveyance in order to create a fee simple at common law. Instead, we have facts, on which there is no dispute, showing complications in a good sized estate in which many members of a family are concerned. We have a submission of the problems to eminent counsel to draw the document which, in their informed judgment, will be effective to clear up the doubts and difficulties which have arisen. We also have undisputed facts as to what the various members of the family did with reference to the transaction subsequently. Now the question that presents itself in litigation is, assuming that the document had the desired effect, when did that effect take place? Insofar as the problem is one of inferring the actual intent in the minds of the various parties from the undisputed facts which occurred before and after the settlement, that inference is indisputably for the Tax Court to make. Insofar as the question is one of effect to be gathered from the four corners of the document, the inference is not so clearly a question of fact, but involves what we call mixed fact and law, for want of a better term.[4] The inference to be drawn varies, obvi-

The following footnotes are in the exact order in which they appeared in the original statement:

[4] The description of the grandchildren of the testatrix was "all the children which (the named child of the testatrix) has or may hereafter have."

[5] The term "extraordinary distribution" includes stock dividends, stock rights, securities acquired upon the exercise of rights and the proceeds of rights which were sold.

[6] The parties seemed to think that had she known of this marked increase in her residuary estate, Sallie Houston would not have made such unequal disposition hereof.

[7] The Orphans' Court in its adjudication filed by Judge Sinkler on October 8, 1941, indicated that, under Pennsylvania law, these extraordinary distributions had been properly distributable as income to life tenants. Counsel consulted by the interested parties expressed the opinion that Grandmother Houston's gift of the residue was, under Pennsylvania law, invalid.

[8] Joseph deF. Junkin, Esq., and John G. Johnson, Esq.

[9] Decedent's rights stem from both her father's and her mother's estate. As an heir of Sallie Houston, she would have an interest in Sallie Houston's rights to the "extraordinary distributions."

[2] Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.

[3] 1944, 323 U.S. 119, at page 124, 65 S. Ct. 169, at page 171, 89 L.Ed. 113.

[4] Accord, Trust of Bingham v. Commissioner, 1945, 325 U.S. 365, at page 370, 65 S.Ct. 1232, at page 1235, 89 L. Ed. 1670: " * * * Ordinarily questions of reasonableness and proximity are for the trier of fact, here the Tax Court. [Citing cases.] And even when they are hybrid questions of 'mixed law and fact,' their resolution, because of the fact element involved, will usually

ously, in every case of either a factual nature or one of mixed law and fact, according to the features which one stresses and the features which one disregards as unimportant. This matter of factual inference, we are told clearly by the Supreme Court, is one for the Tax Court to draw. Its conclusion is to stand, we are told further, unless clearly unsupported by fact or reason.[5]

We cannot say in this case that the conclusion reached by the Tax Court here is unreasonable. The very fact that all the Tax Court concurred in one view[6] and this Court, following the first hearing, reached a different conclusion, shows, we think, that the question is a close one and the facts are reasonably susceptible of differing conclusions. This is further proved by the presence of concurring and dissenting opinions among the members of this Court after two very able arguments.

From all this we conclude that this is the type of situation where we have been instructed to follow the "hands off" policy with regard to results reached by the Tax Court. The present case is not one where we must choose between the view of Judge Learned Hand and Judge Augustus Hand, expressed in Brooklyn National Corporation v. Commissioner, 2 Cir., 1946, 157 F.2d 450. It seems to us that the Supreme Court decision in Choate v. Commissioner, 1945, 324 U.S. 1, 65 S.Ct. 469, 89 L.Ed. 653, is too close to the type of problem presented here to leave us room for choice.[7] To this may be added, for good measure, the decisions in John Kelley Co. v. Commissioner, 1946, 326 U.S. 521, 698, 66 S.Ct. 299, and Talbot Mills v. Commissioner, 1946, 326 U.S. 521, 698, 66 S.Ct. 299.[8]

The decision of the Tax Court is affirmed.

---

afford little concrete guidance for future cases, and reviewing courts will set aside the decisions of the Tax Court only when they announce a rule of general applicability, that the facts found fall short of meeting statutory requirements. [Citing cases.] * * * "

[5] Accord, Trust of Bingham v. Commissioner, 1945, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670; Commissioner v. Scottish American Co., 1944, 323 U.S. 119, at page 123, 65 S.Ct. 169, at page 171, 89 L.Ed. 113: "The answer [to the problem of judicial reviewability of Tax Court determinations] is to be found in a proper realization of the distinctive functions of the Tax Court and the Circuit Courts of Appeal in this respect. The Tax Court has the primary function of finding the facts in tax disputes weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which it considers most reasonable. The Circuit Courts of Appeal have no power to change or add to those findings of fact or to reweigh the evidence. And when the Tax Court's factual inferences and conclusions are determinative of compliance with statutory requirements, the appellate courts are limited to a determination of whether they have any substantial basis in the evidence. The judicial eye must not in the first instance rove about searching for evidence to support other conflicting inferences and conclusions which the judges or the litigants may consider more reasonable or desir-

able. It must be cast directly and primarily upon the evidence in support of those made by the Tax Court. If a substantial basis is lacking the appellate court may then indulge in making its own inferences and conclusions or it may remand the case to the Tax Court for further appropriate proceedings. But if such a basis is present the process of judicial review is at an end. [Citing cases.]"

[6] Estate of Henry v. Commissioner, 1944, 4 T.C. 423.

[7] This case involved a partnership income tax problem and revolved about the question of whether a transaction of the partnership was a sale or a lease for tax purposes. In 1945, 324 U.S. 1, at page 3, 65 S.Ct. 469, at page 470, 89 L.Ed. 653 the Court stated: "* * * In the second place, the Tax Court found that the parties intended a cash sale of the equipment. That question is argued here as if it were open for redetermination by us. It is not. It is the kind of issue reserved for the Tax Court under Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, and Wilmington Trust Co. v. Helvering, 316 U.S. 164, 167-168, 62 S.Ct. 984, 985, 986, 86 L.Ed. 1352. * * * "

[8] We are aware of the confusion and displeasure that followed the publication of the Dobson doctrine. Proof of this reaction can be noted in Paul, 1946 Supplement to Federal Estate and Gift Taxation (1946) pp. 492-605, inclusive, which contains the most exhaustive survey of

BIGGS, Circuit Judge (concurring).

I concur fully in the views expressed in the majority opinion. If, however, the principle of Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, were inapplicable in the case at bar, I would conclude none the less that the decision of the Tax Court should be affirmed for it is clear that the decedent, Mrs. Henry, divested herself of taxable interest in the "Standard Oil Securities" and in the "non-Standard Oil Securities." I shall deal in this opinion first with the Standard Oil securities, viz., the "extraordinary distributions" including stock dividends, stock rights, securities acquired upon the exercise of rights and the proceeds of rights which were sold, growing out of Henry H. Houston's original ownership of Standard Oil voting trust certificates. I shall deal second with the extraordinary distributions received from non-Standard Oil securities. A portion of what will be stated in respect to the Standard Oil securities will possess pertinency in respect to the non-Standard Oil securities. The Tax Court, by Judge Mellott, has made such extensive findings of fact in its opinion, 4 T. C. 426-434, that comparatively little need be repeated here. The following will suffice.

As to the Standard Oil Securities.

Henry H. Houston created a trust by his will. His widow, Sallie S. Houston, the decedent, Mrs. Henry, and the decedent's brother and sister, were to share equally in the income from the trust during Sallie S. Houston's lifetime. Upon the latter's death the income payable to Sallie S. Houston was to be paid to the decedent, Mrs. Henry, and to her brother and sister in equal shares until the death of the last survivor, when the principal was to be distributed to Henry H. Houston's grandchildren. Following Henry H. Houston's death in 1895 and before Sallie S. Houston's death in 1913 the trustees received the extraordinary distributions hereinbefore referred to. A large part of them were distributable as income to Sallie S. Houston, to the decedent, Mrs. Henry, and to her brother and to her sister. The trustees, faced with a complex question as to what portions of the extraordinary distributions constituted principal or distributable income, simply added the whole of the extraordinary distributions to principal.

Sallie S. Houston died leaving a will. It provided for specific bequests and for the residue to be divided into twenty-one equal parts to be held in trust for her twenty-one grandchildren. The residuary clause clearly violated the rule against perpetuities. Mrs. Houston also underestimated the amount of the property which would fall into the residuary clause, exclusive of her share in the extraordinary distributions. If, specific bequests aside, the provisions of the will were declared invalid, the decedent, Mrs. Henry, and her brother and her sister would take all of Mrs. Houston's property and Mrs. Houston's grandchildren, some of whom were of age at the time of Mrs. Houston's death, would be disinherited. The decedent, Mrs. Henry, and her brother and her sister and Mrs. Houston's grandchildren who were of age decided that they would effect Mrs. Houston's intention as well as they could and to that end entered into the "Deed of Family Settlement and Trust."

The provisions of the deed will be discussed at some length hereinafter. The

the Dobson doctrine up to the publication date of approximately December 15, 1945. Since the Dobson case, however, the policy of review announced by the Supreme Court has been strengthened by later decisions, and is becoming better understood. H. Ober Hess in a Book Review of Paul's 1946 Supplement (supra) in 94 U. of Pa.L.Rev. 444 (1946) questions Mr. Paul's conclusions concerning the effect of the Dobson doctrine subsequent to the Kelley and Talbot Mills cases. 9 Mertens, Law of Federal Income Taxation § 51.19 (1943), the 1946 Cumulative Pocket Supplement, the December 1946 Quarterly Issue pamphlet and the January 1947 Monthly Issue pamphlet contain discussions of the problem of review of Tax Court determinations and case collections. See also Gordon, Reviewability of Tax Court Decisions (Dec. 1946–Jan. 1947) 2 Tax L.R. 171; Nelson, The "Dobson" Rule Reaffirmed by the "Kelley" Case, 1946, 24 Taxes 105; Note, The Dobson Rule in the Circuit Courts, 60 Harv.L.Rev. 448 (1947); and Recent Case, Judicial Review of Tax Court Decisions (1946) 94 U. of Pa.L. Rev. 339.

deed was signed on or about December 31, 1915, by the decedent, Mrs. Henry, and by her brother and by her sister, and by Mrs. Houston's grandchildren who were then of age. It was not signed by one grandchild who came of age just before he was killed in the first World War. The youngest grandchild, Eleanor Houston [Smith], signed the deed approximately four months after the passage of the Joint Resolution of March 3, 1931, 46 Stat. 1516, 26 U.S. C.A. Int.Rev.Code, § 811 (c), shortly after she had become of age.

The deed purported to dispose of the decedent's, Mrs. Henry's, interest and that of her brother and that of her sister as life tenants in the extraordinary distributions of Standard Oil securities. Mrs. Henry, her brother and her sister were entitled to their share of these distributions not only from the estate of their father, Henry H. Houston, but also from the estate of their mother, Sallie S. Houston. The interests of the grandchildren, and those claiming under them, also were purported to be disposed of by the deed. These claims also rested on both estates. The Commissioner agrees that the deed did dispose of Mrs. Henry's interest as a life tenant in her share of the extraordinary distributions. The difference of opinion between the trustees of Mrs. Henry's estate and the Commissioner is when the deed legally effected its express purpose. The trustees of Mrs. Henry's estate contend that Mrs. Henry made effective disposition of her interest at the instant that she signed the deed on or about December 31, 1915. The Commissioner asserts that the deed was not effective to dispose of Mrs. Henry's interest until it had been signed by Mrs. Eleanor Houston Smith after the passage of the Joint Resolution.

For this reason he contends that Mrs. Henry's interest in the extraordinary distributions is includible in her estate for estate tax purposes. The Commissioner concedes that if the deed became legally effective to "transfer" [1] Mrs. Henry's rights prior to March 3, 1931 no estate tax is due from Mrs. Henry's estate on her share of the extraordinary distributions. Indeed no other position is a tenable one for the Commissioner in view of May v. Heiner, 281 U.S. 238, 50 S.Ct. 286, 74 L.Ed. 826, 67 A.L.R. 1244, which held, in substance, that a retention of income from a trust irrevocable by the grantor could not result in estate tax, and in view of Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858, which held that the Joint Resolution could not take effect retroactively.

It should be pointed out that when the deed was drawn and was signed by Mrs. Henry, by her brother and by her sister and by Mrs. Houston's grandchildren, then of age, on or about December 31, 1915, the federal estate tax was not in existence. No question of tax evasion or of tax avoidance, therefore, lies in the present case. I turn therefore to the deed. The document or indenture of 1915 is more than an agreement. It makes a settlement of family interests, effects the apparent intent of Mrs. Houston as expressed in her will, and creates a trust. It purports to resolve every aspect presented by the failure of the trustees of Henry H. Houston's estate to distribute income during Mrs. Henry's lifetime, to settle the questions presented by the invalid provisions of Mrs. Houston's will, and to do justice to the respective persons who might have entered into a contest. The provisions of the deed were to the advantage of Mrs. Houston's grandchildren for it is obvious that if the deed had not been entered into they could have received nothing from the estate of their grandmother.

The deed in a series of extensive preambles, expertly drawn, covers every pertinent fact upon which the settlement was based and the reasons for making it. After agreeing in Article First to indemnify The Real Estate Trust Company of Philadelphia, the trustee under the will of Henry H. Houston and the executor and trustee under the will of Sallie S. Houston, the decedent, Mrs.

---

[1] It should be pointed out that, strictly speaking, Mrs. Henry did not make a "transfer" of property, retaining for her life the right to the income therefrom. She did waive her right to question the disposition of the extraordinary distributions in the Standard Oil securities made by the trustees of the estate of Henry H. Houston.

Henry, her sister and her brother, and the other signatories "assign, transfer and set over" to the Trust Company "all their right, title and interest of, in and to" the extraordinary distributions. These are words of deed and gift and were intended to convey and did presently convey interests. It should here be noted that the words of the 11th Whereas clause treat of the disposition of Mrs. Houston's estate "from the date of the execution of this Agreement until its final consummation by ultimate division or its possibly being set aside under some future contest as hereinafter mentioned * * *." This language is consistent only with a presently operative deed. Article Second, paragraph fourth, provides for the distribution of Mrs. Houston's residuary estate as specified "For so long a time as this present Deed of Family Settlement or Trust remains in operation and its provisions are being carried out without question * * *." It is clear that distributions made under this article were binding on the decedent, Mrs. Henry, on her brother and on her sister, the three life tenants, when they signed the deed. Distributions were made in accordance with the terms of the article. Article Second, paragraph fourth, of the deed also possesses a "reserving clause," reserving to the decedent, Mrs. Henry, and to her brother and to her sister, certain rights, but these arise only when and if the deed should be questioned by a person entitled to sign it and who might refuse to sign it.

Paragraph fifth of Article Second provides that no person can take any interest or have a claim under the deed unless he "shall have been bound and concluded by having become a party signatory thereto or barred thereby." This means that any person signing the deed became "bound and concluded" and "barred" from any contest. The use of such words shows the intent of the signatories to give up and transfer any present interest which they might have had.

Paragraph sixth of Article Second expresses the "willingness" of the three life tenants, the decedent, Mrs. Henry, and her brother and her sister, "to forego the enforcement of their present right to the distribution and delivery to them" of the securities which are the object of the trust created by the deed because of the desire of the parties to it "to finally and forever settle the questions which have heretofore been attempted to be settled" by the deed. Paragraph sixth also provides that if any of the descendants of Henry H. Houston and Sallie S. Houston are not satisfied with the deed, are not willing to become signatories thereto and to acquiesce in the disposition of the assets of the estate of Sallie S. Houston then the decedent, Mrs. Henry, and her brother and her sister, and the other signatories, shall be "restored in their rights" and the assets of Sallie S. Houston's estate shall stand as though the deed had never been "executed" with the right of the parties to require accounting, subject to interim distribution of income or principal as the same shall have been made.

I think it is clear, as the Tax Court held, that the deed was intended to convey and did convey the interest of Mrs. Henry when she signed it. It also conveyed the interests of the other signatories at the time they signed the deed. The provisions of paragraph sixth of Article Second are typically those of a condition subsequent. The grantees, the trustees, took the property conveyed on the terms prescribed subject to termination on operation of the condition set forth by paragraph sixth, namely, that one of Mrs. Houston's grandchildren[2] should object to the provisions and dispositions of the deed, as prescribed by paragraph sixth. Mrs. Henry held "no string" on the property for she retained no control whatever over it. At no time

---

[2] The Orphans' Court of Philadelphia County, by Judge Sinkler, in an Adjudication (at No. 5 January Term 1896 in the Estate of Henry H. Houston, deceased) filed October 8, 1941, becoming final two weeks later, held that the class of grandchildren entitled to become signatories of the 1915 agreement "was closed when the first grandchild reached the age of thirty years, that is, when T. Charlton Henry became thirty on March 25, 1917." Judge Sinkler also held that the word "descendants" used in the 1915 deed was the equivalent of "grandchildren" and that no great-grandchild possessed standing to sign the 1915 deed or to object to the terms thereof.

could she have regained the property by any act of hers. The covenants of the deed became and remained binding on Mrs. Henry. This, I think, is a complete answer to the contention of the Commissioner that the deed was not effective to convey Mrs. Henry's interest as a life tenant in the extraordinary distributions of the Standard Oil securities until the deed had been signed by Mrs. Smith, approximately four months after the passage of the Joint Resolution in 1931. See Restatement, Property, vol. 1, sec. 24 and comment b, Tiffany Real Property, 3d ed., vol. 1, sec. 194, and Commissioner of Internal Revenue v. Irving Trust Co., 2 Cir. 147 F.2d 946. It is unnecessary to discuss the confirmatory deed of 1922. If it possesses any pertinency it demonstrates the intention of Mrs. Henry to execute a conveyance by the 1915 deed.

I am of the opinion that the Commissioner's position stems from a misapprehension of two decisions, the first being the Adjudication by the Orphans' Court of Philadelphia County hereinbefore referred to. When the first account of the trustees of Henry H. Houston's estate was filed and came on for audit the executors of the decedent, Mrs. Henry, asked, inter alia, that "her share of the stock dividends and other extraordinary corporate distributions" added to the corpus of the trust estate "in accordance with the family agreement of 1915 and the supplemental agreement of 1922" be awarded to them on the ground that under the terms of the sixth paragraph of the Article Second of the 1915 deed the deed was revocable by any descendant "not satisfied with it and not willing to become a signatory thereto and acquiesce in the disposition of the Standard Oil Company securities in accordance therewith." The Orphans' Court denied this claim but stated by way of obiter that when Mrs. Smith executed the deed in 1931 "At that time the agreement became forever final and binding * * *." The Commissioner takes the position that this is the equivalent of a ruling by the Orphans' Court that Mrs. Henry conveyed no estate by the 1915 deed until 1931 when Mrs.

Smith signed it. The Commissioner's contention in this regard clearly is wide of the mark. The Commissioner also seeks support in the decision of the Estate of Henry v. Commissioner, 47 B.T.A. 843, 849, wherein Member Harron stated that "* * * the dividend [one of the Standard Oil distributions] belonged to the trustees as principal of the trust under the 1915 agreement, *which became binding on Sallie Houston Henry and others in 1931.*"[3] But the Board of Tax Appeals was not considering the precise date on which Mrs. Henry executed the transfer but only whether it was made by her on or before January 1, 1935. The fact is that neither the Orphans' Court nor the Board of Tax Appeals had the precise question sub judice in focus.

As to the Non-Standard Oil Securities.

In the adjudication of the Orphans' Court, hereinbefore referred to, the following appears: "The trustees of the estate of Henry H. Houston also received stock dividends on corporate securities other than those of the Standard Oil Company. Samuel F. Houston testified that the life tenants, including Sallie H. Henry, had discussed the matter, with knowledge of their rights to an apportionment, and concluded that the stock should be retained as principal in the same manner as the Standard Oil Company stock dividends. (Notes of Testimony, pp. 88-89.) The life tenants who, in the absence of such an agreement, would be entitled to the stock dividends, made no demand for such dividends, and executed annual waivers and approvals of the trustees' accounts for the years 1928 to 1936, inclusive. Each of the accounts so approved showed in the principal account the amount, value and purchase or sale of all corporate securities, and all stock dividends and warrants received by them. In 1929 a detailed account, prepared by certified public accountants, setting forth principal and income transactions from the inception of the trust, in 1895, to December 31, 1928, was prepared and submitted to each of the life tenants. Thereafter similar accounts were submitted annually, up to and including 1936, to the life tenants. It

---

3 Emphasis added.

was testified that these accounts were carefully examined and discussed by the life tenants, and that they understood the accounts to conform to the family settlement as to what was to be carried as principal, as was manifested by their signing the annual waivers and approvals of the accounts. (Notes of Testimony, pp. 76, 83, 89, 91, 92.)

"None of the life tenants, including Sallie H. Henry, at any time protested the retention of all stock dividends as part of the principal of the trust.

"By the oral agreements as to securities other than those of the Standard Oil Company, and the repeated affirmation of such agreements found in the approval of the various accounts, the life tenants released to the principal of the trust any claims to stock dividends and other extraordinary corporate distributions to which they might be entitled as the income beneficiaries of the trust. When made, this release was irrevocable and could not be set aside or revoked without the consent of all remainder interests which were benefited by such release.

"The stock dividends and other extraordinary corporate distributions on the Standard Oil Company stock, carried in the principal account, have been, and are, properly held as principal, by virtue of the irrevocable family settlement of 1915 and the supplemental agreement of 1922. Stock dividends and other extraordinary corporate distributions upon other corporate securities are likewise properly so held, pursuant to the equally irrevocable oral agreements, confirmed by the approvals of the various accounts, that such dividends should be held in the same manner as the Standard Oil Company stock dividends."

Finding-of-fact 20 of the Tax Court, 4 T.C. at page 431, is as follows: "The trustees of the Houston estate regularly submitted statements of the transactions of the trust to decedent [Mrs. Henry], her brother and sister and all such statements showed all of the extraordinary distributions (both Standard Oil and others) retained in principal and the carrying charges on real estate charged against income. In 1929 the life tenants (including decedent [Mrs. Henry]) signed an approval of all these accounts from 1895 through 1928. In January 1931 they signed approvals covering all of the transactions of the trust through December 31, 1929. Annual approvals were regularly signed thereafter and decedent [Mrs. Henry], prior to her death, had signed an approval of all the transactions of the trust through December 31, 1936."

The Tax Court in its opinion, supra at pp. 441-443, dealt with the problems presented by the non-Standard Oil securities as follows:

"The extraordinary distributions on securities other than those of the Standard Oil companies are in a different category. They were not referred to in, nor were they in our judgment affected by, the deed of family settlement (1915) or the deed of confirmation (1922). This was the view taken by the Orphans' Court in its adjudication, which is probably binding upon us. Freuler v. Helvering, 291 U.S. 35, [54 S. Ct. 308, 78 L.Ed. 634]; Blair v. Commissioner, 300 U.S. 5, [57 S.Ct. 330, 81 L.Ed. 465]; Estate of Henry v. Commissioner, 47 B.T.A. 843. The two types of securities have been kept separate throughout this proceeding, including the notice of deficiency, the stipulation of the parties and the various exhibits. Apparently the only authorization ever given by decedent and her brother and sister to the trustees of Houston's estate under which the non-Standard Oil securities were held as principal consisted of oral agreements to that effect, buttressed by subsequent written annual approvals. No evidence as to the oral agreements was adduced at the hearing before us, although such evidence seems to have been before the Orphans' Court. It held, as set out in footnote 5, that the life tenants, by the annual approvals, had released these securities to the principal of the trust and that the 'release was irrevocable and could not be set aside or revoked without the consent of all remainder interests which were benefited by such release.'

"The 'remainder interests which were benefited' were those specified in Houston's will. They included not only the grandchildren—the class referred to in the 1915 and 1922 deeds—but also 'children of any

deceased grandchild.' In that view, taken by the Orphans' Court and in our judgment correctly so, the non-Standard Oil securities irrevocably passed from the decedent at or about the time they were received and became, for all purposes, part of the trust created by her father. Since there was no reservation of 'possession or enjoyment of, or the right to the income from,' this property, the Joint Resolution of March 3, 1931, is not applicable.

"Respondent has assumed throughout his argument that the non-Standard Oil securities were included in and covered by the 1915 and 1922 deeds. In doing so we think he has erred. The question is important only in the event we have erred in reaching the conclusion expressed in the earlier part of this opinion. At the risk of unnecessarily extending this discussion, it may be pointed out that the 1915 deed referred only to the '"Standard Oil Securities," * * * definitely mentioned in detail, which are now held undistributed in the possession of the Trustees of the Estate of Henry H. Houston, deceased, aggregating an approximate value of $14,000,000.' The several paragraphs comprising the 'premises' of the deed of 1915—i. e., preceding the habendum—and the schedules attached, refer only to the securities received about June 1, 1899, 'from the Trustees of the Standard Oil Trust' and later exchanged for 'Common Capital Stock of the Standard Oil Company of New Jersey,' certificates of subsidiary companies of the Standard Oil Co. of New Jersey delivered to the Trustees of Houston's estate on December 1, 1911, and stock dividends distributed by the Standard Oil subsidiary companies since December 1, 1911. Opinion had been requested from the attorneys, as recited in the deed 'as to what portion, if any, of the said securities so received from the Standard Oil Company * * * constitute principal of such estate * * *.' These were the only securities transferred by the 1915 deed. The 1922 deed is equally explicit in referring only to 'the shares or securities representing or growing out of the testator's holdings of Standard Oil Trust Certificates * * *.'

"From what has been said it is apparent we are of the opinion respondent erred in including in gross estate the value of the extraordinary distributions, received by Houston's trustees, upon the non-Standard Oil securities and we so hold."

In view of all of the foregoing I do not see how it can be contended successfully that Mrs. Henry did not divest herself of all of the non-Standard Oil securities prior to the critical date of March 3, 1931. What she and the two other life tenants, viz., her brother and her sister, had consummated was an agreement or agreements that the non-Standard Oil securities should be as much a part of the trust as the Standard Oil securities. The Orphans' Court specifically found that Mrs. Henry and the other life tenants entered into oral agreements that the non-Standard Oil securities should be treated as if they were part of the trust and repeatedly affirmed these agreements by the approval of the various accounts and the waivers. The Tax Court made the same findings and reached substantially identical conclusions of law. The repeated approval of the accounts of the trustees, both prior to March 3, 1931 and thereafter until 1936, did no more, as the Tax Court has said, than "buttress" the oral agreements theretofore made by Mrs. Henry and the other life tenants as to the disposition of the non-Standard Oil securities. The decision of the Orphans' Court was binding upon the Tax Court as it is upon this court. Central Hanover Bank [& Trust] Co. v. Kelly, 319 U.S. 94, 97, [63 S.Ct. 945, 87 L.Ed. 1282].

Moreover, it should be pointed out that with three exceptions all of the non-Standard Oil securities had been received by the trustees and had been held by them in the principal of the trust prior to January 1, 1930 and that the trustees' possession and the stated disposition were ratified by Mrs. Henry by her execution of the "Approval of Account and Waiver of Filing Same," dated December 4, 1929. The excepted securities are set out in finding-of-fact 18 of the Tax Court and note "3" cited to that finding. See 4 T.C. at page 431. It appears from paragraph 36 of the stipulation filed by the parties with the Tax Court that the exceptions consisted of (1) 16,000 Pennsylvania Railroad rights, issued by the Pennsylvania Railroad on December 7,

1929; (2) 259¼ shares of Standard Oil Company of California alleged by the Commissioner to have been received "for the account of the Estate of Sallie S. Houston in 1930"; and 2,817⅓ shares of Mission Corporation asserted by the Commissioner to have been received "for the account of the Estate of Sallie S. Houston in 1935." The presumption is unjustified that these securities did not become part of the Houston trust until Mrs. Henry had signed the "Approval[s] of Account and Waiver[s] of Filing Same" of June 1932,[4] or of June 27, 1933 or of July 3, 1936, respectively, or that she retained these securities divesting herself of them, as has been argued, only by executing the approvals and waivers referred to. The excepted securities probably constituted considerably less than 1% of the value of the corpus of the trust. As a practical matter therefore could a court hold that Mrs. Henry intended to retain or did retain the excepted securities until she executed the approvals and waivers of 1932, 1933 and 1936? I conceive that the answer assuredly must be in the negative. In the case at bar the minuscule cannot be important in determining the event of taxation.

For the reasons stated I am of the opinion that the rulings of the Tax Court should be supported on the merits.

I am authorized to state that Judge MARIS and Judge KALODNER concur in the views expressed in this opinion.

O'CONNELL, Circuit Judge (dissenting).

As the majority opinion indicates, the case sub judice was heard by a division of this court on January 7, 1946. There was no contest as to the facts or inferences legitimately to be drawn therefrom. We concluded that the sole question presented for our determination was one of law; viz., had decedent made completed gifts in trust, with life income reserved, prior to the effective date of the Joint Resolution of 1931? In the case of the Standard Oil securities, the answer depended upon when decedent became irrevocably and finally bound by the Deed of 1915; in the case of the non-Standard Oil securities, the controlling factor was the nature of disposition of the extraordinary distributions. Our analysis of the problems presented led us to believe that the Tax Court had applied the law erroneously. Consequently, we reached the conclusion that the decision of the Tax Court should be reversed both as to all Standard Oil securities and as to those non-Standard Oil securities on which waivers were executed subsequent to March 3, 1931.

After the opinion of this court was filed on June 11, 1946, respondent petitioned for, and obtained, rehearing before the court en banc. In my view, neither the petition for, nor written and oral arguments at, rehearing introduced any new matter or legal questions not previously considered by the court. Somehow, nevertheless, the "clear-cut questions of law," in the eyes of the majority, suffered a change into a "mixed fact and law" question, with the consequent conclusion that the application of the Dobson doctrine prohibited our review.

Since the facts on the basis of which this case proceeded are undisputed, I still believe that the sole question is one of law unadulterated. As to the Standard Oil securities, taxability depends upon the legal effect of a writing described as a Deed of Family Settlement and Trust; what that effect was, is a question properly determinable by Pennsylvania law. As to the non-Standard Oil securities, decedent's rights under an informal trust agreement likewise required resort to Pennsylvania law. A court of that state has ruled formally on both types of securities in this same estate. If the Tax Court fails to recognize that ruling, does the Dobson doctrine preclude our review? I believe not. See Helvering v. Stuart, 1942, 317 U.S. 154, 164, 63 S.Ct. 140, 87 L.Ed. 154; Trust of Bingham v. Commissioner, 1945, 325 U.S. 365, 381, 65 S.Ct. 1232, 89 L.Ed. 1670; Paul, 1946 Supplement, Federal Estate and Gift Taxation, § 14.22E, p. 602.

The majority opinion seems to me to be inconsistent with both the previous[1] and present position of this court on the appli-

---

[4] The exact date cannot be ascertained from the photostatic copy in the record.

[1] Smith's Estate v. Commissioner, 3 Cir., 1944, 140 F.2d 759.

cation of the Dobson doctrine. As recently as March 4, 1947, this court, in Hallowell v. Commissioner, 3 Cir., 160 F.2d 536, found the question presented to be one purely of law, with the result that the Dobson doctrine could not be urged in support of the Tax Court decision. The criterion for adjudicating such cases as pure questions of law and this case as a mixed fact and law question does not appear in the opinions; nor, I submit, does an independent analysis of the facts of the cases reveal what essential element was lacking in one or present in another to require the unexplained invocation of, or rejection of, the Dobson doctrine.

I believe Trust of Bingham v. Commissioner, supra, and Commissioner v. Estate of Field, 1945, 324 U.S. 113, 65 S.Ct. 511, 89 L.Ed. 786, 159 A.L.R. 230, mark out the course to be followed in the instant case. In both cases, the Circuit Court had reversed the Tax Court on a question of law. The Supreme Court did not take refuge in the Dobson doctrine. Instead, it reviewed each case *on the merits.*

For the foregoing reasons, I believe that it was incumbent upon this court to examine the instrument in question and determine whether the Tax Court was correct in its application of law to the uncontested facts and inferences within its power to draw.

The concurring opinion does make the type of analysis which I believe is required in this case. I disagree, however, with the conclusion reached in that concurring opinion.

I. The Standard Oil Securities.

As was indicated above, a Pennsylvania court had occasion to interpret this same family agreement. In the course of its opinion, that court said, "When Eleanor Houston Smith signed the family agreement in 1931, all parties entitled to become signatories had signed the agreement and had surrendered their rights to revoke it. *At that time the agreement became forever final and binding * * *.*" [2] This opinion has been interpreted by the Tax Court. In a prior case concerning the liability for

an income tax on this same estate, the Tax Court said, "For convenience, we may regard the family settlement agreement as such 'assignment' by the life tenant. The assignment became irrevocable and forever binding in 1931. * * * The Orphans' Court denied the claim, holding that the dividend belonged to the trustees as principal of the trust under the 1915 agreement, *which became binding on Sallie Houston Henry* [decedent in this case] *and others in 1931.*" Estate of Sallie Houston Henry, 47 B.T.A. 843, 849 (1942; brackets and emphasis supplied). These two expressions the concurring opinion discounts as obiter dicta. Proceeding upon an independent analysis of the *instrument* in the light of certain terms of the instrument itself, the concurring opinion holds that the instrument intended to convey and did convey the interest of decedent when she signed it, because return of the property to decedent thereafter could be accomplished only by events beyond her control.

I consider myself bound by what the Pennsylvania court has said. "The determination by the New Jersey courts *of the kind of interest transferred and the time when it was effected* is a matter of local law binding on us." Central Hanover Bank & Trust Co. v. Kelly, 1943, 319 U.S. 94, 97, 63 S.Ct. 945, 947, 87 L.Ed. 1282; emphasis supplied. If the agreement "became forever final and binding" when Eleanor Houston Smith signed, it follows that the agreement was not forever final and binding prior to that time. Something, then, was surrendered by decedent in 1931; for, if the instrument was not binding, decedent's rights were the same as they had been in 1915, at which time it is conceded her legacy was greater than in 1931. It follows, therefore, that the decedent was holding a string on the *entire transaction* including the transfer of her interests until the last person who could upset it was bound. That person, according to the Orphans' Court, was Eleanor Houston Smith. She could not and did not sign before July 23, 1931. At that time, in the words of the Orphans' Court, "the agreement became forever final and binding." Distribution previously made

---

[2] Orphans' Court, Philadelphia County, per Judge Sinkler, adjudication filed October 8, 1941; emphasis supplied.

on an "interim" basis and as "authorized" then became a matter of permanent right. At that moment, Sallie Houston Henry became for all purposes bound by the Deed. She then lost all control over the Standard Oil securities. At that moment, the Joint Resolution of 1931 was operative. Its application to the securities thus transferred by Sallie Houston Henry is therefore not retroactive. Consequently, the inhibitive Hassett v. Welch, 1938, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858, is not controlling.

I consider the fact that the property could revert to decedent only by events beyond her control to be immaterial. The sole test, in my opinion, is whether the property could revert. Examination of the cases on this subject seems to support this contention. In Helvering v. Hallock, 1940, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368, the reversionary interest of the settlor depended upon his surviving his wife, an event beyond his control.[3]

Paragraph 6 of the Deed says: "But if at any time in the future any one or more of the descendants of Henry H. Houston or Sallie S. Houston are not satisfied with this Deed of Family Settlement and Trust, and not willing to become signatories thereto and acquiesce in this disposition of the Standard Oil securities, hereinbefore referred to, and also the disposition of the assets of the residuary estate of Sallie S. Houston, deceased, as hereinbefore provided, then, in such case, it is distinctly understood and agreed by all of the parties hereto that the said three children of Henry H. Houston, deceased, and the other signatories hereto, shall be restored in their rights, whatever they may be, to such legal situation as existed with reference to such Standard Oil securities and the assets of the Estate of Sallie S. Houston, deceased, as though this instrument had never been executed * * *." Decedent voluntarily became party to an instrument which re-served to her those rights she had prior to the signing of the instrument, if an event occurred. At the time she signed, most of the eleven grandchildren of Sallie Houston who eventually became signatories had not signed. That it was to their *financial* interest to do so is undisputed; but it requires no elaboration to point out that humans do not always pursue the course most favorable to their financial well-being. Why else should the decedent have required the grandchildren to become parties? Further, it would have been to the financial interest of Gertrude Houston Woodward and Samuel F. Houston to urge one of their children to refuse to sign; for, under the instrument, these two branches of the family undertook to surrender to decedent's branch a share of what they were almost certain to receive under Sallie Houston's will—a decision of which they might well have repented as time wore on. It was only when Eleanor Houston Smith actually signed, sixteen years later, that such possibilities as these vanished. The Tax Court recognized that the possibility of upsetting the instrument existed, and called it "extremely remote"; but we now know that remoteness is immaterial. Commissioner v. Estate of Field, 324 U.S. at page 116, 65 S.Ct. 511, 89 L.Ed. 786, 159 A.L.R. 230.

Thus far, I have avoided use of such terms of art as "condition precedent," "condition subsequent," and the like. I have done so because I believe that the clear mandate of Helvering v. Hallock, supra, was intended to eliminate such casuistries from consideration in the imposition and adjudication of taxes. Even if respondent's contention, that a condition subsequent was here involved, is accepted, nevertheless I believe that the tax would still apply. If my understanding of Helvering v. Hallock, supra, is correct, that case likewise involved a condition subsequent (309 U.S. at page 115, 60 S.Ct. 444, 84 L.Ed.

---

[3] Cf. Fidelity-Philadelphia Co. v. Rothensies, 1945, 324 U.S. 108, 65 S.Ct. 508, 89 L.Ed. 783, 159 A.L.R. 227; Commissioner v. Estate of Field, 1945, 324 U.S. 113, 65 S.Ct. 511, 89 L.Ed. 786, 159 A.L.R. 230; and Goldstone v. United States, 1945, 325 U.S. 687, 65 S.Ct. 1323, 89 L.Ed. 1871, 159 A.L.R. 1330. These cases are apropos, in that settlor's reversionary interest was dependent upon survival, which obviously was beyond settlor's control. While these cases differ from that at bar in that the gifts assumed an aspect not unlike that of a testamentary disposition, the similarity nonetheless persists that all involve a reversion which settlor could do nothing to bring about or prevent.

588

604, 125 A.L.R. 1368); and yet the reversionary interest was deemed sufficient to warrant the imposition and collection of an estate tax. I know of no reason why this particular condition subsequent, if such it be, should receive preferential treatment.

II. The Non-Standard Oil Securities.

The non-Standard Oil securities present a very different situation. As pointed out by the Tax Court, these securities were not referred to or affected by the Deed. The Orphans' Court adjudication, which the Tax Court and concurring opinion concede to be probably binding, informs us that these distributions on these securities were to be retained as principal in the same manner as the Standard Oil Company stock dividends. The life tenants made no demand for these distributions and signed annual waivers and approvals for the years 1928 to 1936, inclusive. Each of these approvals, the Orphans' Court said, constituted an irrevocable release.

Thus, decedent each year surrendered absolutely distributions to which she was entitled under Henry Houston's trust. Each time she signed the waiver, she was irrevocably bound. No string, therefore, was retained on those distributions concerning which she signed waivers prior to March 3, 1931, and an estate tax would not be applicable. After March 3, 1931, since she chose by waiver to permit the distributions to become principal,[4] she effectually created trusts in which she had reserved a life estate in the income. This brings her four-square within the provisions of the Joint Resolution of 1931. That these latter distributions may escape taxation by treating them as "minuscule," on the basis of their constituting less than 1% of the value of the corpus of a trust approximating $14,000,000, seems to me a novel concept. May the incidence of tax, minuscule or not, be excused by our court without congressional authorization?

It cannot be overemphasized that the Pennsylvania adjudication noted a cardinal distinction between the Standard Oil and non-Standard Oil securities; with the latter, decedent was irrevocably bound each year from 1928 to 1936; with the former, she became irrevocably bound only when Eleanor Houston Smith signed the Deed.

For the reasons stated, I adhere to the original decision of this court that decedent's share of the extraordinary distributions on the Standard Oil securities, and her share of the "stock dividends and other extraordinary corporate distributions" of the non-Standard Oil securities on which she executed waivers subsequent to March 3, 1931, are taxable to her estate; and I would affirm the Tax Court only as to the non-Standard Oil securities on which she executed waivers prior to March 3, 1931. I wish to add, however, that, if May v. Heiner is no longer law, and if the retention of a life estate in the income is sufficient to warrant imposition of an estate tax, all securities involved in this case would be an appropriate object of taxation by the Commissioner. My comments concerning the degree of vitality left in the May v. Heiner doctrine are contained in the dissenting opinion filed in the case of Commissioner v. Church, 3 Cir., 1947, 161 F.2d 11.

---

[4] The exact words of the Orphans' Court were: "By the oral agreements as to securities other than those of the Standard Oil Company, *and the repeated affirmation of such agreements found in the approval of the various accounts*, the life tenants released to the principal of the trust any claims to stock dividends and other extraordinary corporate distributions to which they might be entitled as the income beneficiaries of the trust. *When made*, this release was irrevocable * * *." (Emphasis supplied.) It should be noted that the Tax Court did not inquire into the nature of the oral agreements.