## Houston Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

KLEIN, P. J., December 10, 1962.—Henry H. Houston died on June 21, 1895, leaving a will by item fifty-ninth of which he devised and bequeathed his residuary estate to his executors, in trust for the payment of annuities in varying amounts to certain named cousins and the children of another cousin. By paragraphs seventh to fifteenth, inclusive, and by paragraph twelfth of said item fifty-ninth, testator after the death of respective annuitants, provided for gifts over in remainder in similar, almost identical, language in each case, as will be more fully recited hereinafter. The will also contained gifts of annual sums to other persons and churches, and, by paragraph twenty-second, provided for the disposition of the residuary income in the following language:

"All the rest, residue, and remainder of the net income of my estate including herein such income as may fall into and become a part of the residue by reason of

the death of any of the beneficiaries hereinbefore mentioned, I direct shall be paid and distributed one fourth thereof to my beloved wife Sallie S. Houston during her life. One fourth thereof to my daughter Sallie H. Henry during her life, one fourth thereof to my son Samuel F. Houston during his life and one-fourth thereof to my daughter Gertrude Houston during her life. On the death of my said wife I direct that the one fourth of the income payable to her shall thereafter be payable to my said children in equal shares during their lives, and should any of my said children be dead leaving children at the time of the death of their mother I direct that the said income be paid to the children of such deceased child until the death of my last surviving child. On the death of any one of my said children without leaving lawful issue him or her surviving I direct that the income heretofore payable to such deceased child shall be paid to my wife and surviving children in equal shares and if either of the said children shall then be dead leaving issue, such issue shall take the deceased parents share. On the death of any one of my said children leaving lawful issue him or her surviving, I direct that the income to which such deceased child would have been entitled if living, shall be paid in equal shares to and among his or her children and the issue of deceased children, if any there be, such issue taking their deceased parents share, until the death of my last surviving child. *On the death of my last surviving child I direct that the whole of the principal of the trust estate shall be distributed in equal portions to and among my grand-children, the children of any deceased grand-child taking their deceased parents share.*" (Italics supplied.)

Testator also directed that the income directed to be paid to the several persons named in his will should be paid to them free and clear of their respective debts, contracts and engagements of every kind. A copy of

testator's will, certified by counsel to be a true and correct copy, is annexed hereto.

The fund presently accounted for was awarded to the present accountants by adjudication of Sinkler, P. J., dated August 24, 1951, and the occasion of the filing of the present account is stated to be the death of Samuel F. Houston, son of the testator, cestui que trust for life, and one of the trustees, and also the lapse of time since the filing of the second account of the trustees. The statement of proposed distribution also notes that since the filing of the account the trust has terminated by reason of the death of Gertrude H. Woodward, daughter of the testator and last surviving cestui que trust, on October 2, 1961.

Liberty Real Estate Bank and Trust Company is stated to be surviving executor under the will of Samuel F. Houston, deceased cestui que trust and trustee of the present estate.

George Woodward, Jr., Stanley Woodward and Charles H. Woodward are stated to be executors under the will of Gertrude Houston Woodward, deceased.

Sallie H. Henry, daughter of the testator, is stated to have died on June 6, 1938, having had two daughters, Elizabeth W. H. Chatfield and Gertrude H. Dodge, both of whom are still living and receiving one-third of one-third, or one-ninth of the income, each, and a son T. Charlton Henry, who is stated to have predeceased her on January 24, 1936, leaving to survive him two daughters, Isabel Henry Ault and Julia Henry Armour, both of whom are still living and receiving one-sixth of one-third of the income or one-eighteenth thereof, each.

Samuel F. Houston, son of the testator, left to survive him three children, Edith Houston Brown, Margaret Houston Meigs and Eleanor Houston Smith, all of whom are still living and receiving one-third of one-third or one-ninth of the income, each. Samuel F. Houston also had a son Henry H. Houston, 2d, who is stated

to have died on August 18, 1918, intestate, unmarried and without issue. Samuel F. Houston is stated to have been the sole heir and administrator of the estate of the said Henry H. Houston, 2d.

Gertrude Houston Woodward, daughter of the testator, left to survive her three children, George Woodward, Jr., Stanley Woodward and Charles H. Woodward, all of whom are still living and receiving one-third of one-third, or one-ninth of the income, each. She is also stated to have had two other children, Henry H. Houston Woodward and Gertrude Houston Woodward, Jr., who are stated to have died on April 1, 1918 and March 6, 1934, respectively, both intestate, unmarried and without issue, leaving their parents, George Woodward and Gertrude Houston Woodward as their sole heirs at law and next-of-kin.

From the above resume it therefore appears that as of the date of the termination of the trust on October 2, 1961, the date of the death of Gertrude H. Woodward, last surviving child of the testator, there were eight living grandchildren of the testator: Elizabeth W. H. Chatfield, Gertrude H. Dodge, Edith Houston Brown, Margaret Houston Meigs, Eleanor Houston Smith, George Woodward, Jr., Stanley Woodward and Charles H. Woodward, and two great grandchildren of the testator, Isabel Henry Ault and Julia Henry Armour, children of T. Charlton Henry, deceased grandchild of the testator, the other three grandchildren of the testator having all died prior thereto, without leaving issue.

By decree of this court dated September 19, 1961, Francis W. Sullivan, Esq., was appointed guardian ad litem for all minors and trustee ad litem for any possible unborn or unascertained parties in interest or other persons not sui juris.

Under the terms of the will, as quoted above, testator directed that upon the death of his last surviving child,

the principal of the trust estate "shall be distributed in equal portions to and among my grand-children, the children of any deceased grand-child taking their deceased parents share."

The statement of proposed distribution therefore requests the auditing judge to determine whether the principal in remainder is now distributable in equal one-ninth shares to the eight living grandchildren and a one-ninth share, in equal shares, to the two living children of a deceased grandchild, or in equal one-twelfth shares, one share to each of the eight living grandchildren, one share to be divided among the two living great grandchildren, and one share to each of the estates of the three deceased grandchildren who left no issue.

The statement of proposed distribution suggests that the principal is presently distributable in equal one-ninth shares to the eight surviving grandchildren and a one-ninth share to the two living great grandchildren, one-half to each, on the theory that the gifts over in remainder were contingent upon the grandchildren and children of deceased grandchildren surviving the last life tenant. All of the members of testator's family, who are affected by this suggestion, agree to this construction. The Commonwealth of Pennsylvania and the United States of America, however, oppose the suggested construction and contend that gifts over in remainder were vested in all of testator's grandchildren and that the estates of the three grandchildren who predeceased Gertrude Houston Woodward, last surviving life tenant, are each entitled to share in the distribution of the principal in remainder.

There are also pending before the present auditing judge inheritance tax appeals in the estate of Henry H. Houston, 2d, from the assessment by the Commonwealth of Pennsylvania of inheritance tax at two percent on the one-twelfth interest in remainder in the

estate of Henry H. Houston, to which he would be entitled if his interest in remainder were found to be vested, in the sum of $188,531.88; and in the estate of Samuel F. Houston, father and sole heir of the said Henry H. Houston, 2d, from the further assessment by the Commonwealth of Pennsylvania of an additional tax at two percent on the same one-twelfth interest of Henry H. Houston, 2d, as an asset of the estate of the said Samuel F. Houston, if the interest of Henry H. Houston, 2d, in remainder is found to be vested, in a sum stated to be $186,261.24.

Similar tax consequences may result in the estates of Henry H. Houston Woodward and Gertrude Houston Woodward, Jr., and of their parents, George Woodward and Gertrude Houston Woodward, depending upon whether their interests as grandchildren of the testator are found to be vested or contingent.

Counsel for all parties in interest in the estate of Henry H. Houston, for the Commonwealth of Pennsylvania with respect to the two tax appeals already pending and any that may ensue in succeeding devolutions of the affected interests, and for the United States of America with respect to Federal estate tax on all affected interests, have agreed that the disposition by the present auditing judge in his adjudication on the so-called "parent trust" shall be determinative of the vested or contingent character of the remainder interests of testator's grandchildren.

Counsel for the accountants and counsel for the Houston family contend that the gifts to the grandchildren were contingent and that testator intended only the living to receive principal at the termination of the trust. They rely in a large measure upon the principles enunciated in Rosengarten v. Ashton, 228 Pa. 389 (1910). They argue, therefore, that no taxes are due upon these interests, as the testator died in 1895, which was before the imposition of Federal

estate taxes and Pennsylvania direct transfer inheritance taxes.

Counsel for the United States of America and for the Commonwealth of Pennsylvania maintain that testator created a class gift to grandchildren, which was vested, subject only to the possibility of divestiture with respect to the shares of any grandchildren who should die survived by issue. They rely principally in support of their position, upon Carstensen's Estate, 196 Pa. 325 (1900), in which the remainders were held to be vested. They therefore contend that the shares of the three deceased grandchildren and any subsequent devolutions thereof are subject to the taxes in question.

It seems advisable, in approaching problems of this nature, to review briefly some fundamental principles of testamentary interpretation.

In Lewis Estate, 407 Pa. 518 (1962), the court said, at page 520:

"The pertinent principles of law governing the interpretation of a will are well and clearly settled. In Burleigh Estate, 405 Pa. 373, 175 A. 2d 838, the court said, page 376:

" 'It is now hornbook law (1) that the testator's intent is the polestar and must prevail; and (2) that his intent must be gathered from a consideration of (a) all the language contained in the four corners of his will and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his will and (d) the existing facts; and (3) that technical rules or canons of construction should be resorted to only if the language of the will is ambiguous or conflicting or the testator's intent is for any reason uncertain: Dinkey Estate, 403 Pa. 179, 168 A. 2d 337; Pruner Estate, 400 Pa. 629, 162 A. 2d 626; Wanamaker Estate, 399 Pa. 274, 159 A. 2d 201; Hope Estate, 398 Pa. 470, 159 A. 2d 197.' "

There are several other equally basic principles of

construction which we must bear in mind, namely that:

(a) A presumption exists in favor of holding that a gift is vested;

(b) An interest is to be construed as contingent only when it is impossible to conclude that it is vested; and

(c) The presumption that a legacy was intended to be vested applies with far greater force where a testator is making provision for a child or grandchild than where the gift is to a stranger or a collateral relative.

These rules have been succinctly summarized by Mr. Justice Bell, now Chief Justice Bell, in Newlin Estate, 367 Pa. 527 (1951), at page 534:

"Moreover, if it is not clear from the language of the will whether the remainder is vested or contingent, then as Mr. Justice LINN said in Weir's Estate, 307 Pa. 461, 468, 469, 161 A. 730, 'it is necessary to keep in mind the rule "that an interest is to be construed contingent *only when it is impossible to construe it as vested*": Rau's Est., 254 Pa. 464, 98 Atl. 1068; that the intention to create a contingent interest *"should appear plainly, manifestly and indisputably"*: McCauley's Est., 257 Pa. 377, 101 Atl. 827. . . . In Marshall's Est., supra, it is said: "The law leans to vested rather than to contingent estates and the presumption is that a legacy is vested: Carstensen's Est., 196 Pa. 325 [46 Atl. 495]; Tatham's Est., 250 Pa. 269 [95 Atl. 520]; Neel's Est., 252 Pa. 394 [97 Atl. 502]; Rau's Est. [supra], and *'the presumption that a legacy was intended to be vested, applies, with far greater force, where a testator is making provisions for a child or a grandchild,* than where the gift is to a stranger or to a collateral relative:' Wengerd's Est., 143 Pa. 615 [22 Atl. 869]." ' See to the same effect: Groninger's Estate, 268 Pa. 184, 189, 110 A. 465."

In the opinion of the auditing judge, a study of this will from its four corners, in the light of the circum-

stances surrounding the testator at the time he made his will, leads to the inescapable conclusion that he intended the gifts to his grandchildren to be vested and not contingent.

In Marshall's Estate, 262 Pa. 145 (1918), Mr. Chief Justice Brown, who had written the opinion in Rosengarten v. Ashton eight years previously, after referring to the controlling principles of construction which we have reviewed, namely that the law leans to vested, rather than to contingent estates; that the presumption is that a legacy is vested; and that this presumption applies with greater force when provision is being made for a child or grandchild than where the gift is to a stranger or to a collateral relative, continues, as follows at page 148:

"Our cases are without number defining the test to be applied in determining whether a legacy is vested or contingent. Among the latest are Packer's Est., 246 Pa. 116, and McCauley's Est., 257 Pa. 377. In the latter case the rule is thus clearly stated by our Brother STEWART: *'Where a legacy is made payable at a future time, certain to arrive, and not subject to condition precedent, it is vested where there is a person in esse at the time of the testator's death capable of taking when the time arrives, although his interest be liable to be defeated altogether by his own death.'* Charles Marshall was in being at the time of the death of his grandfather. The bequest to him though subject to a precedent life estate, was unconditionally payable to him at the happening of an event certain to happen— the death of his father—at which time he would have been capable of taking if living."

When the testator died in 1895, his three children, Sallie H. Henry, Samuel F. Houston and Gertrude Houston Woodward, were all living and married. He also had six living grandchildren, T. Charlton Henry, Gertrude H. Dodge, Elizabeth W. H. Chatfield, Edith

Houston Brown, Margaret Houston Meigs and Henry H. Houston, 2nd, one of the three grandchildren whose deaths, intestate, in the lifetime of testator's children, have given rise to the present litigation. H. H. Houston Woodward, another of the three deceased grandchildren, was *en ventre sa mere* at the time. Hence, what was said in Marshall's Estate, supra, has direct application to the problem we are considering.

The fact that the gift to the grandchildren is to a class, rather than to named individuals, is not material in determining the character of the remainder interests. In Newlin Estate, supra, the court said, at page 532:

"If a bequest is to a class who take at the death of a life tenant, the fact that the members of the class are unknown or even not in being at the death of the testator, or that their interest is subject to be increased or decreased or divested by subsequent events, will not render the gift contingent . . .: Edwards' Estate, 255 Pa. 358, 99 A. 1010; 360 Pa. 504, 62 A. 2d 763; Overbrook Heights Building & Loan Assn. v. Wilson, 333 Pa. 449, 5 A. 2d 529; Reed's Estate, 307 Pa. 482, 161 A. 729; McCauley's Estate, 257 Pa. 377, 101 A. 827; Lloyd's Estate, 326 Pa. 230, 192 A. 98.

" 'Where an estate is given to a life tenant, with remainder to the children of the life tenant, the estate vests at once upon the birth of each child, subject to open and let in after-born children, . . . without regard to the question of whether or not a child survives the life tenant': Edwards' Estate, 255 Pa. 358, 361, 99 A. 1010; Edwards' Estate, 360 Pa. 504, 508, 62 A. 2d 763."

In the opinion of the auditing judge, the present case is ruled by Carstensen's Estate and not by Rosengarten v. Ashton.

The principles of Carstensen's Estate are firmly imbedded in our decisional law. This is apparent from

what the late Judge John Marshall Gest, who was one of the most eminent probate judges in the country, said in Carson's Estate, 16 D. & C. 99 (1931), at page 102:

"I am equally clear on this branch of the case, that the remainders so given were vested, subject only to be divested in favor of the issue of any of the children who may have died leaving issue. This cannot be doubted in view of Carstensen's Estate, 196 Pa. 325, a case that has been so frequently followed that it would be tedious and unnecessary to refer to all the decisions. I mention, however, Massey's Estate, 235 Pa. 289, Neel's Estate, 252 Pa. 394, and Jennings's Estate, 266 Pa. 60. The gift in favor of the issue of deceased children who have issue does not affect the shares of the children who died without leaving issue. See Buckman's Estate, 13 D. & C. 653."

The contention of counsel for the accountant and the Houston issue that the present case is controlled by Rosengarten v. Ashton, supra, must be rejected for several cogent reasons:

First: Rosengarten v. Ashton must be regarded as sui generis and its application strictly limited. It stands out like a sore thumb in our decisional law. It has often been criticized, rarely followed and usually just ignored.

In Lloyd's Estate, 326 Pa. 230, 235 (1937), we find the flat statement by Mr. Justice Schaffer, who, speaking for a unanimous court, said:

"Rosengarten v. Ashton, 228 Pa. 389, 77 A. 562, has been very much limited in its application by our later decisions."

In Buckman's Estate, 13 D. & C. 653 (1930), Judge Gest said, at page 655:

"Our more recent cases restrict greatly the force of what was said so broadly in Rosengarten v. Ashton. See Groninger's Estate, 268 Pa. 184; Marshall's

Estate, 262 Pa. 145; Jennings's Estate, 266 Pa. 60; Edelman's Estate, 276 Pa. 503."

For other examples of cases in which Rosengarten has been either expressly disapproved or not applied by the courts, see Rickenbach Estate, 348 Pa. 121 (1943); McGlinn's Estate, 320 Pa. 389 (1936); Murphey's Estate, 276 Pa. 498 (1923); Stocker's Estate, 260 Pa. 385 (1918); Rau's Estate, 254 Pa. 464 (1916); Packer's Estate (No. 2), 246 Pa. 116 (1914); Dana Estate, 89 D. & C. 499 (1954).

Second: In view of the disfavor in which Rosengarten v. Ashton has been uniformly regarded by the courts, it should not be accepted as binding authority, except in cases in which the testator has used precisely the same language under the same factual situation that existed in that case. The slightest variations in language and attending circumstances may lead to wholly different conclusions with regard to testator's intent, and therefore to wholly different results: Byrne's Estate, 320 Pa. 513, 523 (1935).

The Rosengarten will provides:

"On the death of the last of my children then to pay over and distribute said trust equally to and among my grandchildren and the issue of such as may be dead, such issue to take the share the parent would have taken if living at the time of the death of my last surviving child."

In contrast, the Houston will provides:

"On the death of my last surviving child I direct that the whole of the principal of the trust estate shall be distributed in equal portions to and among my grandchildren, the children of any deceased grandchild taking their deceased parents share."

In the Rosengarten will, the primary gift included not only testator's grandchildren but also "the issue of such as may be dead", whereas, in the instant case, the primary gift is expressly to grandchildren as a

class. Moreover, in the former case the testator referred to the grandchildren's share as the share they "would have taken if living at the time of the death of my last surviving child." This clearly indicates, as Chief Justice Brown pointed out in Marshall's Estate, supra, in discussing Rosengarten v. Ashton, at page 147, that ". . . the condition of participation in the distribution of the estate of the testator was life at the time of distribution." No such condition exists in the present case, and the gift to the children of any deceased grandchild is, specifically, of "their deceased parent's share," indicating a substitutionary or divesting intent, only. These differences, in our opinion, are sufficient, in themselves, to distinguish the two cases.

Third: In reaching its decision in the Rosengarten case, the court relied in a large measure upon the "Pay and Divide" rule. This rule has been abolished in Pennsylvania. In Dickson Estate, 396 Pa. 371, 374 (1959), Mr. Justice Bell, now Chief Justice, said, at page 374:

"The executor of Arthur's estate seeks to establish an intestacy in five-sevenths of the principal of his father's trust by applying the so-called 'Pay and Divide' Rule. Whatever may have been the justification for the origin of this judicially created technical Rule, it has vanished, leaving in its wake a welter of conflict and confusion. See: Newlin Estate, 367 Pa. 527, 536, 80 A. 2d 819; Rickenbach Estate, 348 Pa. 121, 125, 34 A. 2d 527; Hood's Estate, 323 Pa. 253, 259, 186 A. 740; Alburger's Estate (No. 2), 274 Pa. 15, 18, 117 A. 452. Moved by the experience of the past and a desire to eliminate confusion for the future, the 'Pay and Divide' Rule is henceforth to be taken as abolished."

To the same effect see Hope Estate, 398 Pa. 470, 477 (1960).

Counsel for the Houston interests make much of the

fact that in disposing of the income in the twenty-second subparagraph of Item Fifty-ninth, testator clearly indicated that he intended only living persons to receive income and hence it follows that he intended only living grandchildren to receive principal. We cannot accept this reasoning. The manner in which income is to be distributed is rarely a dependable guide for the ultimate disposition of the trust corpus.

Let us examine more closely Item Fifty-ninth of the will. Paragraph eighth of this item provides as follows:

"Eighth: I direct that out of the said income the sum of Three hundred dollars be annually paid to my first cousin Mrs. Sarah B. Burrows (now residing in Iowa) during her life and at her death I direct to be paid out of the principal of the residuary estate the sum of Five thousand dollars in equal shares *to such of the children of my said cousin as may be living at the time of her decease,* the children of any deceased child of hers taking however their deceased parents share." (Italics supplied.)

This language was repeated in substantially the same form in the ninth, tenth, eleventh, twelfth, thirteenth, fourteenth and fifteenth paragraphs of this item, in which the testator similarly gave annual gifts of income to designated *collateral relatives,* for their lives, and directed that a stipulated sum be paid out of the principal of the residuary estate, in equal shares, to such of the children of the income beneficiaries as might be alive at the time of the decease of said relative, the children of any deceased child taking the parent's share.

Here in eight separate instances within the very framework of the questionable Item Fifty-ninth, testator's gifts of shares of principal in remainder to *collaterals* are expressly restricted to children of the life tenant "living at the time of her (or his) decease",[1]

revealing a clear consciousness or awareness on the part of the testator of the requirement of survivorship as an incident or condition of taking, as contrasted with the unqualified, and hence vested, character of the gifts of the residue which he obviously intended for his grandchildren.

Let us look again at that portion of paragraph twenty-second of this item which disposes of the corpus of the estate:

". . . On the death of my last surviving child I direct that the whole of the principal of the trust estate shall be distributed in equal portions to and among my grand-children, the children of any deceased grandchild taking their deceased parents' share."

Why did the testator omit the condition of survivorship, which he had imposed on so many other gifts in remainder, from the gift of the residue to his grandchildren? Are we to assume that it was omitted as the result of an oversight or a mistake? We have no right to do this.

Henry H. Houston, the testator, was a very wealthy man. He was represented by William W. Porter, one of the leaders of our bar at the time this will was signed. We can fairly assume that the will was prepared by Mr. Porter, because he was one of the subscribing witnesses and the testator, in Item Sixty-third, directed that the executors ". . . in all matters requiring legal services or advice . . . consult my attorney William W. Porter, Esq."

The will is a meticulously drawn, precise instrument and indicates that a great deal of careful, expert thought was devoted to its preparation. It must be assumed that the testator understood the provisions of the instrument and that the language he used unequivocally expressed his well-thought-out intentions. When he wished only living persons to receive income, he said so clearly; when he wished only the living to receive

principal, he was equally clear. We must, therefore, conclude that he regarded his grandchildren in a more favored category than his collateral relatives and desired the gift to them to be vested if they survived him. This comports with the rationale of the many cases to which we have heretofore referred, which hold that the presumption of vesting is much stronger if the gift is to a child or grandchild than if it is to a stranger or collateral relative.

The following extract taken from what we said in Dana Estate, 89 D. & C. 499 (1954), at page 510, is particularly pertinent to the present discussion:

"It is one of the basic rules of construction early embodied in our law, that, in the absence of a clear expression of contrary testamentary intent, the immediate vesting of future interests is favored. We find no such contrary intent in the present will.

"Six times in his will and codicil testator demonstrated that he knew precisely how to make survival of a given event a prerequisite to taking. Thus, in paragraph 3, he used the expression, 'to her issue if she had any living at her death'. In paragraph 13, and three times in paragraph 14, testator refers to his daughter's 'living issue at her death'. He used similar language in item 2 of his codicil. Testator's failure to attach the condition 'if living' to the alternative gifts in remainder is therefore crucially significant and leads persuasively to the conclusion that testator intended the disputed gifts to be vested: Brumbach Estate, 373 Pa. 302 (1953); Bomberger Estate, 347 Pa. 465 (1943)."

Mr. Biddle, in his brief and in his oral argument, referred to the Act of June 29, 1923, P. L. 914, substantially reenacted in section 14(4) of the Wills Act of April 24, 1947, P. L. 89, which provides:

". . . hereafter when, in and by the provisions of any . . . will . . . property, either real or personal, or both, shall be . . . devised, or bequeathed, either

directly or in trust, for the use and benefit of any person, . . . for years or for life or upon condition, and which shall provide therein that, upon the termination of the estate for years or for life or upon breach of condition or other cause, the remainder over shall vest in the . . . testator's heirs or next of kin or the persons thereunto entitled under the intestate laws, or other similar or equivalent phrase, the same shall be construed as meaning the person or persons thereunto entitled at the time of the termination of the estate for years or for life or upon condition under the intestate laws of the Commonwealth as they shall exist at the time of such termination; and such phrases shall not be construed as meaning the person or persons who were the heirs or next of kin of the donor at the time . . . the testator died: Provided, however, That nothing herein contained shall be construed to prevent any . . . testator from expressly or by necessary implication directing otherwise: . . ."

Mr. Biddle concedes that this statute cannot apply, technically, to the present will which became effective many years prior to the passage of the act. He contends, however, that it does reflect the policy of the Commonwealth with respect to the question of vesting.

We do not think it necessary to discuss this argument, except to say that whatever rights the grandchildren had were fixed when the testator died. The legislature could not thereafter constitutionally disturb these rights retroactively. But, even if, arguendo, we were to hold that section 14(4) of Wills Act of 1947 applies, the auditing judge would feel obliged to rule that the distinctions between the various gifts in remainder heretofore pointed out contained the "necessary implication" that testator intended "otherwise".

It would be manifestly unfair to attribute to the testator any intention predicated upon circumstances existing today, which he could not have anticipated or

contemplated 70 years ago, in 1892, when he executed his will.

Although the present litigation arises primarily because of the possible liability of certain of the remainder interests for Federal estate taxes and Pennsylvania direct transfer inheritance taxes, it is clear that the testator could not have considered the impact of these taxes on his estate, because he died many years before the United States Congress and the Pennsylvania legislature enacted the laws levying these taxes. We cannot, therefore, attach any significance to the question of possible tax liability in our deliberations concerning testator's intentions with respect to these remainder interests.

Likewise, a will must be interpreted in accordance with the decisional law as it existed at the time the will was written: Lyman Estate, 366 Pa. 164 (1950); Hood v. Pennsylvania Society to Protect Children from Cruelty, 221 Pa. 474 (1908). There can be no doubt that in 1892, and for over 100 years prior thereto, under the decisions in this state, gifts in remainder, would have been construed as vested, rather than contingent, wherever possible.[2] This is a persuasive factor in confirmation of our conclusion that the remainders to testator's three grandchildren, Henry H. Houston, 2d, Henry H. Houston Woodward and Gertrude Houston Woodward, Jr., who died in the lifetime of testator's daughter, Gertrude H. Woodward, were intended to be vested and not contingent, and the auditing judge so finds. . .

---

[2] For examples of cases in which the interests were held to be vested, see Wager v. Wager, 1 S. & R. 374 (1815); Minnig v. Batdorff, 5 Pa. 503 (1847); Smith's Appeal, 23 Pa. 9 (1853); Manderson v. Lukens, 23 Pa. 31 (1854); Passmore's Administrator's Appeal, or Etter's Estate, 23 Pa. 381 (1854); Chew's Appeal, 37 Pa. 23 (1860); Young v. Stoner, 37 Pa. 105 (1860); Buzby's Appeal, 61 Pa. 111 (1869); Peterson's Appeal, 88 Pa. 397 (1879).

And now, December 10, 1962, the account is confirmed nisi.

Supplemental Adjudication

KLEIN, P.J., August 9, 1963.— On December 10, 1962, I filed an adjudication in this estate in which I ruled that the remainder interests of Henry H. Houston, 2d, Henry H. Houston Woodward and Gertrude Houston Woodward, Jr., grandchildren of the testator, Henry H. Houston, all of whom died in the lifetime of testator's daughter, Gertrude H. Woodward, were vested, and that their estates were each entitled to receive a one-twelfth share of the residue in distribution.

Exceptions were filed by the parties adversely affected by my decision.

On February 13, 1963, before argument was heard on the exceptions, a petition seeking a review of the adjudication was filed by Gertrude Henry Dodge and Elizabeth W. Henry Chatfield, grandchildren of testator, being children of his deceased daughter, Sallie H. Henry, and by Isabel Henry Ault and Julia Henry Armour, testator's great-grandchildren, children of T. Charlton Henry, Sallie H. Henry's deceased son.

In this petition they allege, inter alia:

"10. At the audit all patries assumed that the disposition of the entire fund in the trustees' hands was governed solely by the testator's will, and the Auditing Judge quite naturally acted on the same assumption in making his awards. After the filing of the adjudication counsel for the petitioners came to realize that they should have called the Auditing Judge's attention to certain agreements—partly written and partly oral —by which the testator's three children made large additions to the trust fund out of stock receipts apportionable to them under the Pennsylvania Rules of Apportionment. The basic agreement is embodied in a Deed of Family Settlement and Trust dated Decem-

ber 31, 1915, of which a copy is attached as exhibit "B", and this was supplemented by a Deed dated December 1922, of which a copy is attached as exhibit "C", and by oral agreements whose terms are reflected in the adjudication filed by this Court (per Hon. Charles Sinkler) on October 8, 1941.

"11. The 1915 and supplemental agreements mentioned in paragraph 10 hereof were made part of the records of this Court at the audit of the trustees' first account, which was adjudicated by Judge Sinkler in 1941; and in an adjudication filed in 1951 on the trustees' second account Judge Sinkler held that the spendthrift clause of the will of Henry H. Houston did not prevent an assignment of income from the funds added to the trust by those agerements and thereby in effect ruled that the additions constituted a separate trust of which the income beneficiaries were the settlors.

"12. According to an estimate made by the trustees, the additions made by the life-tenants pursuant to the 1915 and supplemental agreements constitute a very substantial part of the whole trust fund.

"13. The proper disposition of the funds added to the trust by the 1915 and supplemental agreements requires an interpretation of those agreements; and since the Auditing Judge, through no fault of his own, failed to give any consideration to them, the interests of justice require that the case be referred back to him so that he may have an opportunity of considering them before the case proceeds any farther."

They therefore asked for a citation to show cause why the adjudication "should not be opened for review so that the Auditing Judge may reconsider the whole case in the light of the 1915 and supplemental agreements and such testimony as may properly be received in elaboration of those agreements."

Preliminary objections were filed to this petition by

the Commonwealth of Pennsylvania and the United States of America, contending that petitioners were barred by laches, as all of the matters pleaded were contained in the record in the case and could not be considered as newly discovered evidence or excusable neglect. Preliminary objections were also filed in behalf of certain of the "Woodward" interests. Answers on the merits were filed by other parties in interest to which a reply was filed by petitioners.

In view of the large amount of money involved in this litigation, and in order to give all parties in interest the fullest opportunity to present their views, the court on March 29, 1963, entered a decree dismissing the exceptions *pro forma* and referring the matter back to the auditing judge, at his request, for further consideration.

It should be noted that the request for a review merely asks that the adjudication be opened so that the auditing judge may reconsider the whole case in light of a number of miscellaneous instruments, agreements and circumstances. It nowhere specifically states what the parties propose to accomplish thereby. The real purpose of the review, however, appears to be an attempt to separate the testamentary trust presently accounted for into several component trusts: the original testamentary trust under the will of Henry H. Houston; and two or more trusts inter vivos under deeds or agreements among the parties in interest under the testamentary trust, in the obvious hope that the decision of the auditing judge with respect to vesting of remainder interests under the testamentary trust can be held not to apply to the separable trusts.

Sallie S. Houston, testator's widow, and their three children, Sallie H. Henry, Samuel F. Houston and Gertrude H. Woodward, were named by testator as primary beneficiaries of his residuary trust. The widow died in 1913, a resident of Philadelphia. She

appointed as her executor the Real Estate Trust Company of Philadelphia, now Liberty Real Estate Bank and Trust Company, one of the accountants in the present proceedings. By her will she directed that the principal of her residuary estate be divided into 21 equal parts to be held in trust for her grandchildren until they attained the age of 30 years. She favored the children of her son, Samuel F. Houston and her daughter, Gertrude H. Woodward by giving them 18 of said 21 parts, collectively. The remaining three parts she gave to the children of her daughter, Sallie H. Henry. It was generally agreed among the members of the family that the testatrix was under the belief that her estate had a value of $630,000, whereas in fact its value was approximately $1,700,000. Executor was advised by counsel that her will may have violated the rule against perpetuities, and that an intestacy might result, with title to the property vesting in her three children. Executors and beneficiaries of the estates of testator and his wife were likewise advised by counsel that the widow and the three children might be entitled, under the Pennsylvania rules of apportionment, to large distributions of the stock of the Standard Oil Companies, which had been distributed as a result of the order of the United States Supreme Court in the "Standard Oil Trust Case" of 1911. (221 U.S. 11). This order had directed distribution of the stock of the various Standard Oil subsidiary companies to the holders of Standard Oil of New Jersey stock which executors had received in exchange for 11,775 "Standard Oil Trust Certificates" owned by decedent at the time of his death. Further stock dividends were also received by the trustees subsequent to the 1911 order of the Supreme Court.

In order to settle these serious problems and to avoid unpleasant litigation, a Deed of Family Settlement and Trust was entered into, under date of December 31,

1915, by testator's three children and his grandchildren who were of age, by their respective spouses, and by The Real Estate Trust Company of Philadelphia, both "as one of the Trustees under the Will of Henry H. Houston, deceased" and as "Executor and Trustee under the last Will of Sallie S. Houston, deceased".

Following the execution of the Deed of Family Settlement and Trust in 1915, additional stock dividends were received by the trustees on Standard Oil securities. Attention was directed to the fact that the 1915 deed referred only to stock dividends received theretofore and consequently did not clearly indicate that it also applied to stock dividends received after December 31, 1915. Accordingly, testator's three children signed an additional agreement in 1922, in which they declared that they had intended in the 1915 deed to waive their right to claim future as well as past Standard Oil stock dividends. They further confirmed and ratified "the purpose and intent of said deed of family settlement as hereinabove stated" and released and quitclaimed to then trustees any present and future rights to Standard Oil stock dividends.

Counsel for the Henry interests now contend that we are dealing not with one trust but with several. They maintain that in addition to the trust created by testator in his will, which is composed of the assets originally received by the trustees, other trusts were created consisting of the securities which were subsequently added to the trust by the action of the children. They take the position that these later created trusts are separate and apart from the original trust created under the will and should be construed independently. They argue that the remainders created under these so-called later trusts should be held to be contingent, in view of the intent of the parties who created them, regardless of the decision with respect to the award of the original assets.

Mr. Biddle also contended that, since testator's three children created a new trust when they executed the 1922 deed and because Henry H. Houston, 2d, and Henry H. Houston Woodward, two of testator's grandchildren, had died prior thereto, their estates could not have qualified as beneficiaries under the deed, even if they had been expressly named therein, and hence the parties must have intended that only the grandchildren living at the time of the termination of the trust could participate in the distribution. He relies in support of his position upon the basic principle of trust law found in 2 Scott on Trusts, 2d §112.3 and the Restatement of Trusts, 2d §112(f), that one may not legally create a trust for the benefit of a deceased person.

These theories are most interesting and ingenious but, in the opinion of the auditing judge, completely devoid of merit.

It would require a dextrous feat of semantic distortion to attribute to the signatories to the 1915 deed the construction for which the Henry heirs are now contending. The intention of the parties is set forth clearly and expressly and the instrument is free from doubt, uncertainty or ambiguity. It speaks for itself and requires no interpretation. "The court cannot ignore the plain, clear, or unambiguous language of a contract. Construction is necessary where the terms of a contract are ambiguous. Where, however, the intent of the parties is expressed in clear and unambiguous language, there is no need, or room for construction or interpretation, and a court may not resort thereto, since in such a case the parties to the contract must be presumed to have intended what they expressed in the contract; . . .": 17A C. J. S. Contracts §294; Atlantic Refining Co. v. Wyoming National Bank, 356 Pa. 226, 233 (1947); Spigelmire v. North Braddock School District, 352 Pa. 504, 511 (1945); Greek v. Wylie, 266 Pa. 18,

24 (1920) ; Sharp v. McKelvey, 196 Pa. Superior Ct. 138, 144 (1961).

There can be no question concerning the reasons for making the deed and the purposes the parties intended to accomplish by it.

It is futile to suggest that the signatories to the deed created trusts of any kind. What they did, primarily, was to waive and surrender any rights which they may have had, as income beneficiaries, to the proceeds of the application of the Pennsylvania Rule of Apportionment to the securities held in the trust estate.

Much of Mr. Biddle's argument is sheer sophistry and requires no answer. He cannot avail himself of the benefit of hindsight and now make black out of what is obviously white.

One of the principal reasons which induced the parties to enter into the 1915 deed was their desire to "fulfill and expressly carry out" the wishes of the testator and his wife that no inventory or account of their estates be filed in any public office. Another important factor was the children's concern that neither of their parents, when they made their respective wills, "had in contemplation the extraordinary results found to have resulted" from the testator's investment in the Standard Oil stocks, "nor, in the case of their mother, what was the full value of her actual estate", and the possible legal effect of the provisions in her will.

The children stated specifically in the deed that they were desirous "of effecting and carrying out, as far as possible, what they believe to have been" the parents' purposes and intent and "also to effect an equitable division among her grandchildren of the income and principal of the assets" composing the mother's separate estate. To achieve this end they were willing "to abandon what they are advised as aforesaid are their legal rights to the present possession of this large amount of property from both of said estates, and to

compromise such claims by now declaring and agreeing that all of such Standard Oil securities shall remain in the possession of the Trustees of the Estate of Henry H. Houston, deceased, and, subject to the provisos of this agreement, shall be treated as part of the principal of his estate as though he had died seized and possessed thereof, and that the income therefrom and the principal thereof shall be distributed in accordance with the provisions of his Will. . . ."

The avowed purpose of the parties in making this deed of settlement was "to forever settle and determine . . . all questions of every kind and character as to the securities" in testator's estate and the assets in the residuary estate of his wife "and to fully and finally make this a family settlement of the property involved in this disposition, so that no questions concerning the same may ever hereafter be raised and litigated in any Court of law, and the same shall be treated as finally settled and disposed of by this Instrument; . . ."

This is what the 1915 deed was meant to accomplish and this is precisely what it did.

Provision was made for the payment of income to testator's children for life and payments of $50,000 per annum to such of their spouses as might survive them. The questions involving the wife's will were adjusted by an agreement that all of the remainder above the fixed sum of $630,000, the amount which they believed she estimated to be the value of her estate, was to be divided equally among all of her grandchildren.

One of the most crucial paragraphs of the deed provides:

". . . the entire income which had been represented by and theretofore paid to the deceased daughter or son of Henry H. Houston arising from the securities mentioned in Schedules 'B', 'C' and 'E' shall be paid and distributed by the Trustees of the Estate of Henry H. Houston, deceased, to and among such persons and in

*such manner as is provided by the Will of the said Henry H. Houston as though the questions heretofore settled and determined had never been raised, and the securities which were producing such income had formed part of the unquestioned principal of his estate. In like manner the principal of such securities, or the moneys or securities represented thereby, shall continue to be held by said Trustees, and shall eventually be distributed in all particulars as though the same had formed an unquestioned portion of the principal of the estate, of which said testator died seized and possessed."* (Italics supplied.)

How these clear provisions can be perverted to mean what the Henry interests now contend is difficult to comprehend.

This is not the first time the Henry interests have challenged this trust. An account of the Henry H. Houston estate was filed following the death of Sallie H. Henry, testator's daughter, on June 6, 1938. Mr. Biddle, who is now appearing as counsel, and Gerald Ronon, as her executors, requested that her share of the stock dividends and other extraordinary corporate distributions, which have been added to the corpus of the trust in accordance with the family agreement of 1915 and the supplemental agreement of 1922, be awarded to them on the ground that, under the terms of the sixth paragraph thereof it was revocable by any descendant who was not satisfied with it and not willing to become a signatory thereto and acquiesce in the disposition of the Standard Oil Company securities in accordance therewith. The claim was based on the fact that several of the great-grandchildren were not sui juris at the time, and, upon attaining majority, had failed to become signatories to the deed.

Judge Sinkler, in a scholarly and comprehensive adjudication filed on October 8, 1941, upheld the validity of the 1915 deed, the 1922 supplemental agreement

and the oral agreements of the parties and ruled that the claim was not well-founded and dismissed it. In his adjudication, after pointing out that none of the life tenants, including Sallie H. Henry, at any time protested the retention of all stock dividends as part of the principal of the trust, Judge Sinkler said:

"The trustees of the estate of Henry H. Houston also received stock dividends on corporate securities other than those of the Standard Oil Company. Samuel F. Houston testified that the life tenants, including Sallie H. Henry, had discussed the matter, with knowledge of their rights to an apportionment, and concluded that the stock should be retained as principal in the same manner as the Standard Oil Company stock dividends. (Notes of Testimony, pp. 88-89). The life tenants who, in the absence of such an agreement, would be entitled to the stock dividends, made no demand for such dividends, and executed annual waivers and approvals of the trustees' accounts for the years 1928 to 1936, inclusive. Each of the accounts so approved showed in the principal account the amount, value and purchase or sale of all corporate securities, and all stock dividends and warrants received by them. In 1929 a detailed account, prepared by certified public accountants, setting forth principal and income transactions from the inception of the trust, in 1895, to December 31, 1928, was prepared and submitted to each of the life tenants. Thereafter similar accounts were submitted annually, up to and including 1936, to the life tenants. It was testified that these accounts were carefully examined and discussed by the life tenants, and that they understood the accounts to conform to the family settlement as to what was to be carried as principal, as was manifested by their signing the annual waivers and approvals of the accounts. (Notes of Testimony, pp. 76, 83, 89, 91, 92).

"By the oral agreements as to securities other than those of the Standard Oil Company, and the repeated affirmation of such agreements found in the approval of the various accounts, the life tenants released to the principal of the trust any claims to stock dividends and other extraordinary corporate distributions to which they might be entitled as the income beneficiaries of the trust. When made, this release was irrevocable and could not be set aside or revoked without the consent of all remainder interests which were benefited by such release.

"The stock dividends and other extraordinary corporate distributions on the Standard Oil Company stock, carried in the principal account, have been, and are, properly held as principal, by virtue of the irrevocable family settlement of 1915 and the supplemental agreement of 1922. Stock dividends and other extraordinary corporate distributions upon other corporate securities are likewise properly so held, pursuant to the equally irrevocable oral agreement, confirmed by the approvals of the various accounts, that such dividends should be held in the same manner as the Standard Oil Company stock dividends."

Even if it is conceded that Judge Sinkler's decision is not controlling with respect to the question now before us, the auditing judge regards his conclusions as extremely persuasive in negating the novel contentions now being advanced by the Henry interests.

The matter came before Judge Sinkler again in 1951, when an account was filed by reason of the death of Thomas Newhall, one of the trustees. Samuel F. Houston and Gertrude H. Woodward, two of testator's children, each entitled to one-third of the trust income, made assignments of a portion of their respective shares of income in order to take advantage of the benefits of the Federal Technical Changes Act of 1949. Judge Sinkler ruled, in an adjudication filed August

24, 1951, that the spendthrift limitations in the will did not prohibit the assignments and, in effect, again affirmed the validity of the 1915 deed, the 1922 supplement thereto and the later oral agreement of the parties. He accordingly awarded the entire balance of the trust principal to the then trustees of the testator's estate "upon the further trusts set forth in the Will."

The validity of the Family Agreement of 1915 was also upheld by the United States Board of Tax Appeals in 1942 (47 U. S. Board of Tax Appeals Reports 843) and again in 1947 by the Circuit Court of Appeals of the Third Circuit (161 F. 2d 574). As a result, the payment of substantial taxes was avoided in both instances.

Mr. Biddle makes much of the fact that Henry H. Houston, 2d, and Henry H. Houston Woodward, two of testator's grandchildren, died in 1918, after the deed was created, but before the execution of the 1922 agreement. The thrust of his argument appears to be that the parties to the 1922 agreement could not possibly have intended that the estates of deceased grandchildren should participate in the assets which would be added to testator's trust estate by virtue of the agreement and therefore it is evident that they intended survivorship at the time of the termination of the trust as a condition for participating in the distribution.

The auditing judge is completely unimpressed with this argument. In the first place, none of the signatories to the 1915 deed had the right to change its provisions or terminate the family settlement unilaterally. Their agreement was final and irrevocable. However, the 1922 deed does not in any manner change its terms. On the contrary, it is a specific confirmation of the earlier instrument by testator's three children, who were the sole income beneficiaries at the time. The reason for making the 1922 deed is set forth in the following language contained therein:

"AND WHEREAS, the Trustees of said estate have requested from said life tenants a written confirmation of the intent and purpose of said agreement of family settlement as stated above and a release unto them of any claim which said life tenants might now or might hereafter have to any shares or securities which now, or which at any time hereafter, by virtue of stock dividends or other corporate action or distribution or otherwise howsoever, might represent said original Standard Oil Trust Certificates, or the shares which on December 31, 1915, represented the same as set forth in said deed of family settlement, or which might result from the holding of any thereof; . . ."

Testator's three children agreed specifically to:

". . . hereby confirm and ratify the purpose and intent of said deed of family settlement as hereinabove stated, and do hereby forever release and quitclaim unto the Trustees under the will of Henry H. Houston, Deceased, any and all right, title, interest or claim which they might now or might at any time hereafter have to any shares or securities which have heretofore or which may hereafter come into the hands of said Trustees as a result of any stock dividends, corporate distributions or otherwise howsoever, because of the holding by said Trustees of any of the shares or securities set forth in said deed of family settlement; . . ."

The auditing judge is satisfied that the 1922 deed did not in any way change the provisions of the 1915 deed dealing with the disposition of the income or principal forming part of the estate of Henry H. Houston or dilute its effect. It merely confirmed the life tenants' disclaimer of future, as well as past, Standard Oil Company stock dividends.

When the 1915 deed was executed, the family situation was substantially the same as when testator died in 1895. His 3 children and all of his 12 grandchildren were then living. At that time the parties had no way of

knowing which of testator's issue would be living when the date for distribution arrived. This may be the reason the Henry heirs carefully refrain from discussing the intention of testator's children as interpreted in the light of the circumstances existing in 1915, when the basic deed was signed. They placed their emphasis on the situation which existed in 1922, when the supplementary deed was executed.

In our original adjudication of December 10, 1962, we pointed out that Henry H. Houston, the testator, could not have considered the impact of Federal estate taxes and Pennsylvania direct transfer inheritance taxes, because he died many years before the United States Congress and the Pennsylvania legislature enacted the laws levying these taxes. It is equally clear that his children and grandchildren, who signed the Deed of Family Settlement and Trust in 1915, could not have given any consideration to Federal estate tax or Pennsylvania inheritance tax problems, because both of these taxes were enacted subsequent to the date of the execution of the deed.

It would serve no useful purpose to discuss In re Smith, 49 So. 2d 337 (Florida Supreme Court, 1950) and Welch v. Brown, 283 Mass. 467, 186 N. E. 636 (1933), cited by Mr. Biddle. In the opinion of the auditing judge, they have no bearing on the present controversy.

The auditing judge is also of the opinion that in neither the 1915 deed, nor the 1922 deed, did the parties attempt to change the provisions of the will of Henry H. Houston, the testator. But even if they had, it is extremely doubtful that they could now be sustained by this court in their endeavor to maneuver their interests into a more favorable position than that to which they were committed by the instrument from which they derived.

Mr. Biddle's arguments are premised largely upon the proposition that most of the present trust corpus would have been distributed to the income beneficiaries had the Pennsylvania Rule of Apportionment been applied to the proceeds of the securities held in this estate. Nowhere in the record has this assumption been definitely established and to attempt to calculate the apportionments at this time would be a momumental, perhaps impossible, undertaking. This would be truly opening *Pandora's box*, requiring, after the passage of 50 years, a review and reshuffling of the estates of testator, of testator's wife, and also the estates of their deceased issue. The members of this family have received many benefits under the 1915 deed. They avoided much involved and costly litigation and substantial liabilities for income taxes for many years. The family also avoided liability for Federal estate taxes and Pennsylvania inheritance taxes in the estates of the deceased income beneficiaries. After receiving these benefits for so many years, they cannot now be permitted to evade the legal obligations which follow from their voluntary act. Moreover, one important basic fact must not be overlooked. Testator's three children, as life tenants, would have been the principal beneficiaries of any apportionments made prior to 1915. Under the provisions of the deed, they abandoned their claims to the fruits of such apportionments. As a result, large holdings which might have been distributed as income remained in the corpus of the trust and is now being distributed to testator's grandchildren and great-grandchildren. None of them had any assurance that their parents would have left these proceeds to them and they cannot now be permitted to accept the munificent benefits of the family settlement without accepting the other provisions and conditions contained therein.

The adjudication of December 10, 1962, is accord-

ingly confirmed and the account is reconfirmed nisi, August 9, 1963.

*Morgan, Lewis & Bockius, John Russell, Jr.,* and *Grubb, Guest & Littleton, Frederick C. N. Littleton,* for accountants.

*Pepper, Hamilton & Scheetz, James A. Montgomery, Jr., Paul Maloney, Cuthbert H. Latta, Jr., John E. Walsh, Jr., Charles J. Biddle,* for exceptants.

*Stradley, Ronon, Stevens & Young, Richard K. Stevens,* contra.

*Irvin Stander,* for Commonwealth.

*Sidney Salkin, Drew J. T. O'Keefe, John G. Penn, Louis F. Oberdorfer,* for United States.

Sur Exceptions to Adjudication
and Supplemental Adjudication

BOLGER, J., November 15, 1963.—The exceptions relate to the conclusions of the auditing judge that testator's grandchildren took vested remainders in the trust and that the fund distributable is but a single trust and not a multiple one, passing pursuant to the terms of testator's will. We have carefully studied the briefs of the parties and weighed all of the arguments presented. As a result we are unanimously of the opinion that the auditing judge is correct in all of his conclusions for the reasons stated in his scholarly opinions. There are, however, some pertinent observations that we believe should be made.

We are satisfied that there are two additional phases of testator's will which are important in determining his testamentary intention. The first deals with his solicitude for the spouses of his then two married children. After bestowing gifts of $100,000 to his wife and to each of his children, he gave like sums of $100,-000 to each of the spouses of his married children. From this it would appear that he was concerned about

providing for the possible spouses of his grandchildren, none of whom were married at the date of the execution of the will. The second reference is to paragraphs seventh, eighth, ninth and tenth of the will, wherein he gave the home in which he lived with his wife, Sallie, to her for life and on her death to his son, Samuel F. Houston, for life, and *on his death to his children in fee*. To his daughter, Sallie H. Henry, he gave the "dwelling she now occupies with the grounds attached" during her life and *on her death to her children in fee*. The home occupied by his son, Samuel F. Houston, was given to the latter for life and *on his death to his children in fee*. To his then unmarried daughter, Gertrude Houston, later Woodward, he gave a tract of ground for the purpose of building a home upon it, for which purpose he gave her $75,000, for her life, and on her death to her children in fee; however, should Gertrude die without leaving children, this share of real estate should fall into the residue. This latter contingency, however, was not attached to the gifts over of real estate to the other children.

The foregoing devises of real estate clearly gave vested interests to the children of his son, Samuel, and of his daughter, Sallie, both of whom were then married and had children. He limited the gift to his daughter, Gertrude, to her life with contingent remainders to her children, apparently because she was then unmarried and childless. It is also of some significance that the duration of these gifts of real estate were for the respective lives of the several children and not, as is the case in the gift of the residue, in trust for the life of the last surviving child. We consider these circumstances of more weight in determining testator's intention than exceptants' argument that because gifts of income were limited to living persons only, that testator intended that gifts in remainder should be to living grandchildren only.

The thrust of exceptants' argument that the grandchildren's interests are contingent would appear to be directed not only toward the conclusion of vesting reached by the auditing judge, but also generally against the doctrine of vested estates. This is implicit in their reference to the lack of logic in making gifts in remainder to deceased's grandchildren, two of whom have been dead 45 years and another 29 years; that the testator did not intend to permit grandchildren, remaindermen, to alienate or encumber their inheritances by borrowing thereon or permitting their inheritances to go outside of the blood line before coming into possession of their interests; that since all income beneficiaries must live in order to inherit, likewise testator intended that all remaindermen must survive the trust in order to inherit.

Our understanding of the difference between contingent and vested remainders derives, inter alia, from Vol. 1, Book II, page 168, Chapter XI of Sharswood's Blackstone's Commentaries (1889):

". . . remainders are either vested or contingent. Vested remainders (or remainders executed, whereby a present interest passes to the party, though to be enjoyed in futuro) are where the estate is invariably fixed to remain to a determinate person, after the particular estate is spent. As if A. be tenant for twenty years, remainder to B. in fee; here B.'s is a vested remainder, which nothing can defeat, or set aside."

In Chew's Appeal, 37 Pa. 23 (1860), Justice Strong stated:

". . . When land is given to one person for life, or for any other estate upon which a remainder may be dependent, and after the determination of that estate it is devised over, whether to persons *nominatim* or to a class of persons, it will vest in the objects to whom the description applies at the death of the testator."

In Letchworth's Appeal, 30 Pa. 175, 179 Chief Justice Lowrie in awarding a share to the widow of a deceased heir, said:

"The law always and naturally inclines to attribute the real and substantial ownership of property to some existing person, even in the case of a trust, and never to leave any part of it in abeyance. In other words, it always inclines to treat the whole interest as vested, and not as contingent; and therefore, in case of doubt or mere probability, it declares the interest vested." The opinion commended the devolution.

In Chess' Appeal, 87 Pa. 362, 365, the court said:

"The inclination of the courts is always in favor of the vesting of legacies, because in ninety-nine cases out of a hundred it is the intention of the testator that his bounty should be transmitted to the children or family of the beneficiary, otherwise indeed full effect is not given to it."

In Hope Estate, 398 Pa. 470, 476, the court quoted from Newlin Estate, 367 Pa. 527, 533: " ' "... If there is a *present right* to a future possession, though that right may be defeated by some future event, contingent or certain, there is nevertheless a vested estate . . ." ' "

In Hunter's Pennsylvania Orphans' Court Commonplace Book, Vol. 6, Vested and Contingent Interests, page 137, §1(a) appears:

"If the testator's meaning is vague, a remainder will be construed as vested rather than contingent; what is required in such case is not that the words of the will admit of a possible, or even reasonable, inference that the testator intended a contingent remainder, but that such intention should appear plainly, manifestly and indisputably, otherwise the estate in remainder is always held to be vested:" (citing cases)

There are two separate and distinct parts of the contested residuary clause. The first part reads as

follows: "On the death of my last surviving child, I direct that the whole of the principal of the trust estate shall be distributed in equal portions to and among my grandchildren . . ."

Had the testator stayed his pen there, we would have no problem, any more than would have been presented in determining the nature of the gifts over to grandchildren of testator's real estate in paragraphs seventh, eighth, ninth and tenth of the will. In both instances, the gifts are clearly vested. The second part of the clause is not separated by any punctuation mark nor is it joined or disjoined by any conjunction from the first part. In unbroken continuity it proceeds:". . . the children of any deceased child taking their deceased parent's share." It cannot be doubted that the language of this second part does not involve a direct gift because the children of any deceased child cannot take until the death of the parent and, therefore, its application is merely substitutionary. There is no distinction specified between living or deceased grandchildren nor is the interest of any grandchild divested because he might die childless before the termination of the trust. In this situation we find the need to apply several well established principles of law, the first of which is that the divestiture of any vested interest to be effective must be complete. Here the divestiture is limited to grandchildren dying leaving children and is incomplete because it does not divest the interest of any grandchild dying childless. In Chew's Appeal, supra, after providing a life estate, testatrix gave one-fourth of her residuary estate to her brother, Benjamin, "for and during his life and after his decease or in the event of his dying before me, to the several children of my brother, their heirs, executors and administrators as tenants in common; should any of the children of my brother be deceased leaving children, their children so left shall stand in the place of and

represent their parents." It was held that the remainder to the children of Benjamin was vested; that "a gift to a person following a life estate is generally not held to denote a condition that the legatees shall survive such a person nor to define when the interest shall vest, but only to mark the time when the gift shall take effect in possession." It was held that the divestiture was only in the event of a child dying leaving children and that the death of a child during the particular estate without leaving children did not amount to a complete divestiture of his vested interest. Another principle of law is as already enunicated hereinbefore, that a vested interest can be divested and declared contingent only by language which is plain, manifest and indisputable. The Restatement of Property deals clearly with this subject. In Ch. 19, §254, we find:

"Limitation Over on the Failure of a Prior Taker Under Some Circumstances to Survive.

"In a limitation purporting to create a remainder or an executory interest in a person, the inclusion of a supplanting limitation with respect to some, but not all, failures of such person to survive to a future time, tends to establish. . .

"(b) that such interest is subject to no requirement of survival except the restricted one which is expressed."

Among the many Pennsylvania Annotations of this principle, we find, inter alia, Conner's Estate, 346 Pa. 271, 274, wherein there was an absolute gift followed by other provisions touching its enjoyment and further limitations, which purposes did not exhaust the beneficial interest and, therefore, there was held to be no failure of purpose; that the absolute gift remained intact: (citing cases.) See also Carstensen's Estate, 196 Pa. 325.

In Hinkson v. Lees, 181 Pa. 225, testator, Pearson, devised land to Pike for life and after his death to his lawful child or children and to their heirs and assigns, but if Pike should die leaving lawful issue to survive him or leaving such issue who should not live to be the age of 21 years nor their lawful issue . . . then . . . to the children of W. Pike had 3 children who attained 21 years, one of whom then died in the lifetime of his father leaving to survive him a daughter who attained full age and died before Pike. It was held that the interest of Pike's deceased son was vested and could be divested, if at all, only upon the occurrence of the contingency on which the devise already depended, which did not happen. Therefore, the devisee under the will of Pike's daughter shared in the proceeds of the property.

Applying these principles to the residuary clause in controversy here, we conclude that the vested interests given, inter alia, to Henry H. Houston, 2d, Henry H. Houston Woodward and Gertrude Houston Woodward, Jr. were not divested expressly, clearly or completely by language which is plain, manifest and indisputable. The only possible defeating event expressed in the will has not occurred, grandchildren dying leaving children.

Exceptants cite six or more of what they regard as logical reasons why testator should have preferred contingent rather than vested remainders. In the light of the foregoing, this argument is irrelevant. Furthermore, when examined and tested in the crucible of the arm-chair theory, its invalidity becomes at once apparent. The best approach to the testing of this argument is that adopted by the Supreme Court in Vandergrift Estate, 406 Pa. 14, 27, where it pointed out a fact as self-evident which is equally so here, that testator fully recognized that a contingency might arise in which a grandson (son) or granddaughter (daughter) might survive him leaving neither a child or children.

We must assume, since this is a lawyer-drawn will, not only that testator had such possibilities in mind, but that his counsel explained to him the implications involved in the event of such deaths or survivals, including the points now raised by exceptants. We can and must assume that testator must have rejected all such reasons; otherwise he would have adopted the simple expedient of expressly providing that only those grandchildren should share in remainder who survived the last surviving life tenant. He, no doubt, was advised that in providing a vested remainder to his grandchildren, he was giving them the liberty of alienating their estates either in life or by will or have them devolve under the intestate laws when, as and if they died before the last surviving life tenant. In our opinion, the will clearly gives to the three deceased grandchildren vested interests. To hold otherwise, we would be required to insert the word "surviving" or other suitable language in the contested clause. This obviously we cannot do.

Our careful scrutiny of the family agreements of 1915 and 1922 and of the record facts associated with the administration of the trust satisfied us that the proposition propounded by the Henry branch of the family that such agreements created a new and distinctly separate trust from the one created by the will of testator consisting of the stock dividends apportionable to the three life tenants is groundless. The learned auditing judge's rulings on this subject are so clear and convincing that we are satisfied that nothing profitable can be added to his supplemental adjudication, wherein he has ruled upon this point.

All the exceptions are dismissed and the adjudication and supplemental adjudication are confirmed absolutely.