ESTATE OF ALTO B. CERVIN, DECEASED, BENNETT W. CERVIN, EXECUTOR, AND NITA-CAROL CERVIN MISKOVITCH, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Cervin v. Commissioner
Docket No. 24773-92
United States Tax Court
T.C. Memo 1994-550; 1994 Tax Ct. Memo LEXIS 558; 68 T.C.M. (CCH) 1115; 68 Trade Cas. (CCH) P1115; October 31, 1994, Filed *558 Decision will be entered under Rule 155. For petitioner: Claude R. Wilson, Jr.
For respondent: Chalmers W. Poston, Jr. and Charles M. Ruchelman. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $ 134,278.17 in the Federal estate tax of petitioner. The issues for decision are: (1) To what fractional interest discount is petitioner entitled in connection with its 50-percent undivided interests in two parcels of real property; and (2) whether 100 percent of the proceeds of three whole life insurance policies should be included in petitioner's gross estate. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time of the filing of the petition, Bennett W. Cervin (Cervin) resided in Dallas, Texas, and Nita-Carol Cervin Miskovitch (Miskovitch) resided in Paris, France. Alto B. Cervin (decedent), a resident of Dallas, Texas, died on *559 December 3, 1988. Decedent was survived by his son, Cervin, and his daughter, Miskovitch. Petitioner timely filed an estate tax return on March 5, 1990. Farm and Homestead
At the date of his death, decedent owned an undivided 50-percent interest in approximately 657.3 acres of real estate (the farm) and an undivided 50-percent interest in a homestead, both located in Texas. Cervin and Miskovitch owned, in equal shares, the remaining 50-percent interests in these properties. The fair market value of the farm at the date of decedent's death was $ 650,000. The fair market value of the homestead at the date of decedent's death was $ 625,000. On March 5, 1990, petitioner filed a United States Estate Tax Return, Form 706, for decedent's estate. The undivided one-half interest in the farm was reported at a value of $ 243,750, and the undivided one-half interest in the homestead was reported at a value of $ 234,375. Petitioner attached to the estate tax return a copy of an appraisal report prepared by A.C. Mosher III (Mosher). Decedent had acquired the farm by purchasing three separate parcels of land consisting of 334.94 acres, 287.02 acres, and 12.8 acres. Approximately *560 40 percent of the property was suited for farming, another 30 percent was suited for ranching, and the remaining land consisted of floodplain. A creek ran through the center of the property, and various gullies were scattered throughout the property. At the date of death, only the northern portion of the land had direct access to a paved road. Any partition of the farm would result in an amount of land suitable for farming well below the minimum amount of acreage necessary for a profitable operation (2,000 acres). Respondent sent a notice of deficiency to petitioner on August 13, 1992, disallowing the 25-percent discount for decedent's 50-percent interest in the farm and in the homestead. MONY Whole Life Insurance Policies
Decedent's wife, Manita Cervin (Mrs. Cervin), died intestate on September 26, 1978. She was a domiciliary of Texas at the time of her death. Prior to her death, Mrs. Cervin and decedent purchased with community property funds three whole life insurance policies, Nos. 904-04-84, 909-27-51, and 926-43-37, from Mutual Life Insurance Company of New York (MONY) on the life of decedent. Decedent and Mrs. Cervin paid for the policy premiums from community *561 property funds until Mrs. Cervin's death. One-half of the cash value of the policies was reported in Mrs. Cervin's estate tax return. After Mrs. Cervin's death, decedent paid the policy premiums. Mrs. Cervin's estate passed by intestacy to her children, Cervin and Miskovitch. By operation of Texas intestacy law, Cervin and Miskovitch inherited Mrs. Cervin's interest in the three MONY policies. Cervin and Miskovitch never withdrew the cash surrender value from any of the MONY policies. In preparing decedent's estate tax return, petitioner included one-half of the proceeds from the policies in the amount of $ 65,462.88 in decedent's gross estate. Decedent's estate tax return listed an account receivable from Miskovitch for reimbursement of premiums paid on one-fourth undivided interest in MONY policies Nos. 904-04-84, 909-27-51, and 926-43-37 and an account receivable from Cervin for reimbursement of premiums paid on one-fourth undivided interest in the same three MONY policies. In the notice of deficiency, respondent included the full value of the proceeds of the three policies, $ 130,925.76, in decedent's gross estate. OPINION Issue 1. Fractional Interest Discount
*562 Section 2031(a) provides that the value of a decedent's gross estate shall include "the value at the time of his death of all property, real or personal." Section 2033 provides "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Property included in a decedent's gross estate is to be valued at its fair market value, which "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. The parties do not dispute the fair market value at the date of decedent's death of the farm and the homestead, without regard to decedent's fractional interest. The dispute between the parties concerns the appropriate discount for decedent's fractional 50-percent interests in these two properties. Real estate valuation and the appropriate fractional interest discount are matters of fact to be resolved on the basis of the entire record. Estate of Fawcett v. Commissioner, 64 T.C. 889, 898 (1975); *563 Estate of Campanari v. Commissioner, 5 T.C. 488, 492 (1945); Estate of Henry v. Commissioner, 4 T.C. 423, 447 (1944), affd. 161 F.2d 574 (3d Cir. 1947). Petitioner bears the burden of proving that the values determined by respondent are incorrect. Rule 142(a). Respondent disallowed any discounts and adjusted the value of the undivided one-half interest in the land to $ 325,000 and the value of the undivided one-half interest in the homestead to $ 312,500. Respondent now maintains that the discount for decedent's one-half interest in the land is 6.54 percent and that the discount for decedent's one-half interest in the homestead is 8.20 percent. Petitioner contends that a fractional interest discount of 25-percent is appropriate for both properties. Each party offered expert testimony and appraisal reports regarding the appropriate fractional interest discount. Petitioner's expert, Mosher, was employed with Mosher Company, a full service real estate company. Prior to filing the estate tax return, petitioner hired Mosher to appraise four pieces of property that were part of decedent's gross *564 estate, including the farm and the homestead. His appraisal was attached to the return. Following respondent's notice of deficiency, Mosher prepared a supplemental report that discussed how Mosher determined the discount of 25 percent. Respondent hired Harry Hunsicker, Sr. (Hunsicker), a commercial real estate appraiser, to review the appraisal report prepared by Mosher. Respondent instructed Hunsicker to render an opinion on the appropriate fractional interest discount for the farm and the homestead. Hunsicker determined that the fractional interest discount for the land was equal to 5 percent plus $ 5,000 in partition costs for a total discount of 6.54 percent. He also concluded that the fractional interest discount for the homestead was equal to 5 percent plus $ 10,000 in costs associated with a forced sale for a total discount of 8.20 percent. The experts agree that some discount for decedent's undivided one-half interest in the farm and in the homestead is appropriate; that any partitioning of the farm would be associated with delay, cost, and uncertainty; and that the homestead is not capable of partition and therefore would be subject to a forced sale. The experts disagree *565 as to the difficulty and the cost associated with a partition of the farm and with a forced sale of the homestead. We are not bound by the opinion of any expert, and we may accept an expert's opinion or reject testimony that is contrary to our judgment. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). One expert may be persuasive on a particular element of valuation, and another expert may be persuasive on another element. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Farm
Mosher visited the farm on a number of occasions prior to preparing his initial appraisal report. Mosher determined that the "highest and best" use of the land was for farming and ranching. He concluded in the supplement to his original appraisal that it would not be feasible to partition the farm because of its varied soil type and configuration, its limited access to a paved road, and the uneconomical amount of acreage suitable for farming that would remain after a partition. At trial, Mosher's testimony conflicted with his earlier conclusion that *566 the farm was not capable of partition. Mosher testified that, although it would not be feasible to divide the land by equal acreage, partition of the farm by value would be possible. On cross-examination, Mosher testified: Q Remaining on the farm now, is precise equal acreage a requirement for partition or can actual partition be adjusted according to the value of the property? A It would have to be according to the value of the property. * * * A If two people, say, owned the property, they would examine that property and see the uses to which all the various parts could be put, and if they could agree, they could divide it according to however they wanted. Q According to value? A According to value, whatever that value is in each of their minds.
Mosher also testified that partition by value would be difficult for the same reasons that he believed made partition by equal acreage infeasible. In the supplement to his appraisal report, Mosher discussed additional factors justifying a 25-percent fractional interest discount for the farm. These factors included the lack of control associated with a minority interest in property, the lack of marketability of a fractional *567 property interest, and the difficulty of obtaining mortgage financing for the purchase of a fractional interest. Mosher also included a discussion of a series of recent Tax Court decisions dealing with discounts for minority interests in property. Additionally, Mosher's supplemental report discussed market data that was collected for an article in a real estate journal addressing how minority interest discounts in real property are determined. Mosher testified that his only purpose in including in his report a discussion of these Tax Court holdings and the article's collection and study of fractional interest discounts was to demonstrate that discounts for fractional property interests did occur in the marketplace. His report, however, included no comparable market transactions that he had personally investigated. He admitted he had no actual exposure to sales of fractional interests. We disregard his discussion of cases and commentaries, which is the task of counsel and the Court and not the province of a witness. In contrast to Mosher's report and testimony, respondent's expert, Hunsicker, concluded that the farm was ripe for partition. Hunsicker did not inspect the farm. *568 He relied solely on the appraisal report that was prepared by Mosher to determine the appropriate fractional interest discount for the farm. Hunsicker concluded that the land lent itself to easy partition because of its layout, its large size, its access to the paved road, and the locations of improvements on the property. According to Hunsicker's report and testimony, the farm could be divided into two approximately equal tracts (334.9 acres and 322.32 acres), each of which would have access to the paved road. Hunsicker pointed out in his report that there were two old houses at either end of the farm. He believed that the location of these structures would facilitate partition because each partition would include one of the houses. Hunsicker accepted Mosher's conclusion that the property's "best" use was for farming and ranching. He noted, however, that, because the farm was not subject to any zoning restrictions, it could be used for other purposes, such as a mobile home park. Given his determination that partition of the farm would not be difficult, Hunsicker concluded that a fractional interest discount of 5 percent was appropriate. He estimated that partition costs, *569 including legal, survey, and appraisal fees, would be approximately $ 10,000. In Texas, partition costs are shared among fractional interest owners. Decedent's 50-percent interest would therefore bear $ 5,000 of the estimated partition costs. Hunsicker added the 5-percent discount and the $ 5,000 estimated partition costs to arrive at a total discount of 6.54 percent for decedent's fractional interest in the farm. We are not persuaded by petitioner that partition of the farm is not possible, nor are we persuaded by respondent that the farm is "ripe" for partition. We are persuaded that the farm cannot be partitioned into two equally sized tracts of relatively equal value because of the farm's varied soil composition and layout. Some portions of the land are well-suited for farming and ranching, but other segments are virtually useless because they are considered floodplain. We accept Mosher's determination that it would be difficult to partition physically the land in an equitable manner given the limited access of the farm to the main paved road. We also do not believe that the location of improvements on the farm is relevant because the improvements are currently in a state *570 of disrepair. We are persuaded that the farm may be partitioned on the basis of value. Although it is relevant that the farm is not subject to any zoning restrictions and may be used for purposes other than farming and ranching, we are not persuaded by respondent's discount of 6.54 percent. Such partition would involve substantial legal costs, appraisal fees, and delay. Any partition would require an agreement among interest owners as to the relative values of the land. Based on the record as a whole, we believe that a discount of 20 percent for decedent's fractional interest in the farm should be applied. Homestead
Both experts agree that the homestead cannot be partitioned. When property is not capable of partition, a fractional interest owner may petition the court for a forced sale of the entire homestead with the proceeds to be divided among the interest holders. Beago v. Ceres, 619 S.W.2d 293, 294 (Tex. Civ. App. 1981). The experts disagree as to the difficulty and costs involved in a forced sale of the homestead. Mosher concluded that a fractional interest discount of 25 percent for decedent's 50-percent interest in the homestead *571 was appropriate. He contended that any potential purchaser of decedent's fractional interest would require a substantial discount to offset the legal costs and appraisal fees associated with bringing about a forced sale of the homestead. Mosher also argued that, because the home was in need of substantial repair, any potential purchaser of decedent's fractional interest would require a discount for repair costs as well as for a fractional interest. Hunsicker contended that the condition of the homestead was not relevant in determining the appropriate fractional interest discount. He testified that the homestead would sell quickly in a forced sale because of its lot size and desirable location. Respondent relied upon comparable sales of homes cited in Mosher's appraisal report. Hunsicker determined that a nominal discount of 5 percent was appropriate and estimated that the costs of a forced sale would be $ 10,000. In Texas, the purchaser of a fractional interest discount in property incurs all of the costs associated with a forced sale of the property. Thus, Hunsicker's total estimated discount for the homestead was 5 percent plus $ 10,000 or 8.20 percent. We agree with respondent *572 that petitioner's reliance on the poor condition of the homestead is misplaced because that condition was already considered in determining the agreed fair market value of the homestead. Respondent's conclusion that the homestead would sell quickly in a forced sale seems overly optimistic. We agree with petitioner that a prospective buyer of the homestead would require a sizable discount. Petitioner's claimed discount of 25 percent, however, is excessive because part of this discount is based upon Mosher's estimated repair expenses for the home. On the other hand, the amount of respondent's estimated partition costs of $ 10,000 is too low. Based on the record as a whole, we conclude that a discount of 20 percent for decedent's fractional interest in the homestead is appropriate. Issue 2. MONY Whole Life Insurance Policies
Section 2042 provides for the inclusion in a decedent's gross estate of the proceeds from life insurance policies with respect to which a decedent possessed at the date of his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. The term "incidents of ownership" includes "the power to change the *573 beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy." Sec. 20.2042-1(c)(2), Estate Tax Regs. In determining whether a decedent possessed any incidents of ownership in a policy or any part of a policy, the regulations provide that consideration must be given to the effect of any State law upon the terms of the policy. Sec. 20.2042-1(c)(5), Estate Tax Regs. Under Texas State law, all property acquired during marriage by either the husband or the wife, except by gift, devise, or inheritance, is community property. Tex. Fam. Code Ann. sec. 5.01(b) (West 1993). Prior to 1957, there was some uncertainty in Texas as to whether or not "property" included the proceeds rights in life insurance policies as well as the policy rights. See Sherman v. Roe, 262 S.W.2d 393 (Tex. 1953); Warthan v. Haynes, 288 S.W.2d 481 (Tex. 1956). In 1957, the Texas Legislature amended the State's statutory definition of "property" to include "life insurance policies, and the effects of life insurance *574 policies." Tex. Govt. Code Ann. sec 312.011(13) (West 1988). The Texas Supreme Court stated that, by this amendment, the Texas Legislature had "aligned Texas with other community property states in adhering to the theory that the right to receive insurance proceeds payable at a future but uncertain date is 'property'." Brown v. Lee, 371 S.W.2d 694, 696 (Tex. 1963). The parties agree that, under post-1957 Texas law, both the policy rights and the proceeds rights in a life insurance policy purchased with community funds constitute community property. Thus, because decedent and Mrs. Cervin purchased three insurance policies on the life of decedent with community property, the parties agree that decedent and Mrs. Cervin each possessed an interest in the policy at the time of Mrs. Cervin's death. The parties disagree, however, as to what interests in this community property passed to Mrs. Cervin's estate under Texas law when she predeceased decedent. Resolution of this issue will determine what interests remained with decedent to be included in his estate under section 2042. Mrs. Cervin died intestate in 1978. The intestacy statute in the Texas Probate *575 Code provides: Upon the dissolution of the marriage relation by death, all property belonging to the community estate of the husband and wife shall go to the survivor, if there be no child or children of the deceased or their descendants; but if there be a child or children of the deceased, or descendants of such child or children, then the survivor is entitled to one-half of said property, and the other half shall pass to such child or children, or their descendants. * * * [Tex. Prob. Code Ann. sec. 45 (West 1980).]
Accordingly, when Mrs. Cervin died, one-half of the interest in the community property, including the three MONY insurance policies, passed equally to Cervin and Miskovitch. Petitioner contends that, under the Texas Probate Code, one-half of both Mrs. Cervin's policy rights and proceeds rights passed to Cervin and his sister. Therefore, petitioner maintains that decedent was left with the incidents of ownership in only one-half of the insurance policies when he died. The remaining one-half of the incidents of ownership in the policies belonged in equal shares to Cervin and Miskovitch. Respondent contends that petitioner's analysis of Texas probate law with *576 respect to community interests in insurance policies is oversimplified. Respondent argues that, under Texas law, one-half of the cash surrender value of the three policies passed to Cervin and Miskovitch when Mrs. Cervin died. The remaining one-half of the cash surrender value as well as other incidents of ownership passed to decedent. Respondent maintains that, when decedent died in 1988, he possessed all of the incidents of ownership in the three policies and the right to receive 100 percent of the proceeds of the policies. Thus, respondent argues that, under section 2042, petitioner must include all of the proceeds from the policies in the estate. Both parties rely on the Texas Supreme Court case of Brown v. Lee, supra. In light of the 1957 amendment to the statutory definition of "property", the Texas Supreme Court characterized the right to receive the proceeds from insurance policies payable at a future but uncertain date as "property" that is "in the nature of a chose in action which matures at the death of the insured." Id. at 696. Petitioner also relies on the opinion of the Court of Appeals for the *577 Ninth Circuit in Scott v. Commissioner, 374 F.2d 154 (9th Cir. 1967), revg. and remanding 43 T.C. 920 (1965). In Scott, the executor of a predeceased noninsured wife's estate included one-half of the cash surrender value of the policies on her husband's life as of the date of the wife's death in her estate. Id. at 156. When the insured died approximately 1 year later, the executor of his estate included one-half of the proceeds in his estate, contending that the other one-half passed to the wife's heirs. Id. at 156. The Commissioner argued that the entire policy proceeds less an amount equal to one-half of the cash surrender value at the wife's death should be included in the insured's estate. The Commissioner contended that the wife's only interest in the policies at the date of her death was to receive one-half of the cash surrender value of the policies. Id.
The Court of Appeals analyzed a series of California cases that had applied the "premium tracing" principle to determine the character of the proceeds from life insurance policies. Id. at 159-160. *578 Under the premium tracing principle, policy proceeds are part separate and part community in proportion to the premiums paid with separate and community funds. Scoville, Community Property Rights in Life Insurance 24-25 (1969). The court concluded that these cases demonstrated that, in California, a predeceased spouse's community interest continued in the policy proceeds in proportion to the premiums paid from community funds. Accordingly, the court held that, when the uninsured wife died, bequeathing her one-half interest in the policies to her two sons, her sons became tenants-in-common with the insured husband. The court further held that, to the extent that the insured paid additional premiums after his wife's death, the interest that he and his sons held as tenants-in-common was diminished. Id. at 161. The Scott decision is not controlling in this case because the court's holding derived from California State law. The treatment of life insurance policy proceeds under California law and under Texas law differs. In contrast to California, Texas applies the "inception of title" doctrine to determine the character of policy proceeds. Under *579 this doctrine, the character of a policy is determined at the time of its purchase and is not changed even if premiums are later paid by property of a different character. In addition, the Texas Supreme Court's decision in Brown v. Lee, 371 S.W.2d 694 (Tex. 1963), provides a general rule for the treatment of a predeceased noninsured spouse's community interest in policy proceeds that is inapplicable in California. Different consequences follow in California and Texas when a noninsured spouse predeceases the insured spouse, summarized as follows: To the extent that the policy is community property, when the non-insured spouse dies half of the community property share of the policy will be owned by the decedent's successors, in Washington and California * * *. In Texas, however, the asset appears to be the cash surrender value of the policy rather than the policy itself, and while the successor of the non-insured spouse has half of the cash surrender value, ordinarily the surviving insured spouse gets the other half plus ownership of the unmatured chose. * * * [McClanahan, Community Property Law in the United States, sec. 6:20 (1982); fn. refs. *580 omitted.]
In Brown v. Lee, supra, a husband and wife died simultaneously in a common disaster. The couple had purchased, with community property, an insurance policy on the life of the husband. By statute, the proceeds of the insurance policy were to be distributed as if the insured husband had survived the beneficiary wife. In determining title to the proceeds, the court held: Under circumstances where the uninsured spouse predeceases the insured spouse, settlement of the decedent's community interest in the unmatured chose has ordinarily been resolved by allocating one-half of the cash surrender value to the deceased's estate and the other one-half, plus ownership of the unmatured chose, to the surviving spouse. Thompson v. Calvert, 301 S.W.2d 496 (Tex.Civ.App.1957, no writ). * * * [Id. at 696.]
We have held that this describes the general rule under Texas law as to title to life insurance proceeds where the uninsured spouse predeceases the insured spouse. Estate of Cavenaugh v. Commissioner, 100 T.C. 407 (1993). Under Texas law, the general rule is that the *581 community interest of the uninsured spouse who predeceases the insured spouse is settled by distributing an amount equal to one half the cash surrender value of the unmatured chose to the uninsured spouse's estate and the other one-half interest (plus ownership of the unmatured chose) to the insured spouse. * * * [Id. at 423-424; fn. ref. omitted.]
Petitioner relies in its brief on the use of the term "distribute" rather than "allocate" in Estate of Cavenaugh in referring to the community property interest of the deceased noninsured spouse. The definition of "allocate" includes (1) to set aside for a special purpose and (2) to distribute according to plan. Webster's Second New Riverside University Dictionary (1984). The term "distribute" used in Estate of Cavenaugh is not different than the term "allocate". There is no apparent intention, as petitioner suggests, to imply a different meaning to the term "allocate" than that used by the Texas Supreme Court in Brown v. Lee. The Texas Supreme Court also articulated an exception to the general rule that was announced in Brown v. Lee that was applicable to the facts of that case. *582 The court explained that, "where settlement of the deceased wife's community interest in the policies was not made prior to the death of the insured and her heirs were not guilty of laches in failing to seek such compensation, the wife's community interest was never extinguished". Brown v. Lee, supra at 696. In this situation, the court held that one-half of the policy proceeds belonged to the uninsured spouse's estate and one-half of the policy proceeds belonged to the insured spouse's estate. The exception applied in Brown v. Lee because the husband and wife died simultaneously. There was no settlement of the wife's estate prior to the husband's death, and the heirs could not be charged with laches because of the simultaneous deaths. Petitioner argues that there was no "settlement" of Mrs. Cervin's estate prior to decedent's death, because there was no administration of the estate and because Cervin and Miskovitch did not seek a distribution of the cash surrender value of the policies. At trial, Cervin testified that he and his sister decided, after a discussion with decedent, not to withdraw the cash surrender value from the policies. *583 Cervin also testified that it was his understanding that he and Miskovitch would receive one-half of the policy proceeds when decedent died. Respondent contends that, under the Texas Supreme Court's holding in Brown v. Lee, 371 S.W.2d 694 (Tex. 1963), Mrs. Cervin's community interest in the three insurance policies was "settled" prior to decedent's death. In Brown v. Lee, the court held that settlement of a predeceased, noninsured spouse's community interest in a life insurance policy on the surviving spouse is "ordinarily * * * resolved by allocating one-half of the cash surrender value" to the predeceased, noninsured spouse's estate. Id. at 696; emphasis added. We agree with respondent that Mrs. Cervin's community interest in the policies was settled prior to decedent's death because one-half of the cash surrender value was allocated to her estate and reported on her Federal estate tax return in accordance with the general rule for settlement announced in Brown v. Lee, supra at 694. We need not decide, however, as respondent suggests, that "settlement" occurred at the time *584 of a particular event. Petitioner contends that respondent previously ruled, in Rev. Rul. 75-100, 1975-1 C.B. 303, that under Texas law there was no settlement of an uninsured spouse's interest in a policy on her husband's life prior to the husband's death. The facts assumed in the revenue ruling are distinguishable from petitioner's situation. In contrast to the 10 years that elapsed between the deaths of Mrs. Cervin and decedent, only 10 days elapsed between the uninsured spouse's death and the insured spouse's death under the facts assumed in the revenue ruling. No settlement of the uninsured spouse's interest in the policies occurred because there was insufficient time for settlement. Petitioner argues that the Court of Appeals for the Fifth Circuit has held that the length of time passing between an uninsured spouse's death and an insured spouse's death is not relevant for purposes of determining what interests an uninsured spouse's heirs have in the policy proceeds, citing Estate of Wien v. Commissioner, 441 F.2d 32 (5th Cir. 1971), revg. and remanding 51 T.C. 287 (1968). *585 Petitioner's reliance on Estate of Wien is misplaced because the case did not address the settlement of a predeceased spouse's estate but rather addressed the valuation of a policy owner's interest in a policy on an insured spouse through application of the Georgia Simultaneous Death Act (Ga. Code Ann. sec. 53-11-1 (Michie 1982)). Id. at 40-41. It is improper to take into account the imminence of an insured spouse's death in determining the value of the owner's interest because the Georgia Simultaneous Death Act makes the actual order of death irrelevant. The length of time passing between an uninsured spouse's death and that of the insured spouse, however, is relevant for purposes of determining whether or not the uninsured spouse's estate was settled prior to the insured spouse's death. If the spouses die in a common disaster or within days of each other, there is no time to settle the uninsured spouse's community interest in the policies by allocating one-half of the cash surrender value of the policies to the uninsured spouse's estate. Petitioner has failed to prove that one-half of the cash surrender value of the policies was not allocated *586 to Mrs. Cervin's estate. The evidence is sufficient that such allocation occurred. One-half of the cash value of the three policies was included in Mrs. Cervin's estate tax return. In Texas, where a policy has no cash surrender value or such value cannot be determined, the interpolated terminal reserve method of valuation is used to determine the uninsured spouse's community interest in the policy. Estate of Cavenaugh v. Commissioner, 100 T.C. 407, 423-424 n.10 (1993); Bullock v. City National Bank, 550 S.W.2d 763, 766 (Tex. Civ. App. 1977). The parties disagree as to whether the reported value represented one-half of the cash value or one-half of the interpolated terminal reserve value of the policies. Either value, however, is representative of Mrs. Cervin's community interest. Because the alternative method of valuation is a substitute for known cash surrender value, we deem them equivalent for our own purposes. There was no dispute as to the value reported in Mrs. Cervin's estate tax return of her community interest in the three policies. Thus, one-half of the cash surrender value, or its equivalent, was set *587 aside or "allocated" to her estate. In accordance with the general rule in Texas announced in Brown v. Lee, 371 S.W.2d 694 (Tex. 1963), this allocation settled Mrs. Cervin's community interest in the policies. We must next determine whether or not Cervin and Miskovitch were entitled to one-half of the cash surrender value of the policies at the time of decedent's death. Respondent argues that, because Cervin and Miskovitch failed to exercise their right to compensation from Mrs. Cervin's community interest in the policies during the 10-year interval between Mrs. Cervin's death and that of decedent, their interest in the policies lapsed. Respondent further contends that, under Texas law, any right that the legatees of a predeceased, noninsured spouse have in the cash surrender value of a life insurance policy is extinguished upon the death of the insured where the legatees do not seek a partition of the community estate prior to the insured spouse's death. Volunteer State Life Ins. Co. v. Hardin, 145 Tex. 245, 197 S.W.2d 105 (1946). Petitioner argues that Cervin and Miskovitch were under no obligation *588 to dispose of their one-half interest in the policies by seeking a distribution and that the doctrine of laches is not applicable to their situation. Accordingly, petitioner asserts that decedent's estate is indebted to Cervin and his sister for one-half of the cash surrender value of the policies at the date of decedent's death. Petitioner contends that decedent's estate is entitled to deduct this amount from the estate. Cervin and Miskovitch inherited a taxable property right from Mrs. Cervin's estate that consisted of one-half of the cash surrender value of the policies at the date of her death. Cervin testified that he and his sister deliberately chose not to exercise their right by seeking a distribution of one-half of the cash surrender value from the policies prior to decedent's death. Under Texas law, where the heirs of a predeceased, noninsured spouse fail to seek a distribution of one-half of the cash surrender value of policies prior to the insured spouse's death, their interest in the policies lapses. First National Bank v. United States, 418 F. Supp. 955, 961 (N.D. Tex. 1976), affd. without published opinion 592 F.2d 1188 (5th Cir. 1979); *589 Volunteer State Life Ins. Co. v. Hardin, supra. Although these cases are based on pre-1957 Texas law, their holdings with respect to the treatment of cash surrender value are applicable where a predeceased, noninsured spouse's community estate is settled prior to the insured spouse's death. Accordingly, we reject petitioner's contention that we should permit a deduction from decedent's estate for one-half of the cash surrender value of the policies. We recognize that our holding will appear to result in some double taxation because one-half of the cash surrender value of the policies at the date of Mrs. Cervin's death has already been taxed in her estate. Because Cervin and Miskovitch failed to exercise the taxable property right that they inherited from Mrs. Cervin's estate to seek the cash surrender value from the policies prior to decedent's death, decedent owned the full value of the proceeds, without charge for the prior rights of Cervin and Miskovitch, at the date of his death. Petitioner contends that, if we conclude that 100 percent of the proceeds of the policies is to be included in decedent's estate, petitioner should *590 be permitted to exclude two receivables from decedent's estate. The estate tax return listed receivables from Cervin and Miskovitch representing the amount of premium reimbursements owed to decedent for policy premiums paid by decedent after Mrs. Cervin's death. Cervin contends that he and Miskovitch intended to repay to decedent these amounts because they believed that they were the owners of one-half of the proceeds of the policies. Because we have ruled that decedent is the sole owner of the proceeds of the policies, petitioner argues that no repayment is necessary and that the receivables should not be included in decedent's estate. Respondent argues that the claimed elimination of receivables from decedent's gross estate is a new issue, raised for the first time in petitioner's trial memorandum, as to which respondent would have conducted discovery and is now prejudiced. In view of the specific identification of these receivables on the tax return, discovery on the life insurance issues that were raised in the statutory notice logically would have inquired into these receivables. The payment of premiums was a part of the ownership issue, and the reported receivables are *591 integrally related to that issue. Inclusion of the full proceeds of the policies is inconsistent with a premium obligation to decedent by his children. Elimination of the receivables is a natural consequence of respondent's adjustments. Based on the evidence, the gross estate should be reduced by the reported amounts of those receivables. Decision will be entered under Rule 155.